508 So.2d 1086 (1987)
Willis L. PERRY
v.
SEARS, ROEBUCK & CO., et al.
No. 56539.
Supreme Court of Mississippi.
May 27, 1987.
*1087 Jack B. Weldy, Hattiesburg, for appellant.
Patrick H. Zachary, Zachary & Zachary, Hattiesburg, for appellee.
Before WALKER, C.J., and ROBERTSON and ANDERSON, JJ.
ANDERSON, Justice, for the Court:
This appeal from the Chancery Court of Forrest County presents us with a story all the more depressing for being sadly familiar. Willis Perry served the Sears, Roebuck organization faithfully and with distinction for some twenty years. He was almost within sight of retirement when Sears unceremoniously dumped him because of a personality conflict with his immediate supervisor. This is not the first time we have taken note of corporate callousness towards loyal workers. See., e.g., our remarks in Shaw v. Burchfield, 481 So.2d 247 (Miss. 1985). In that case, we observed with chagrin that "the attendant rights and burdens are imposed by law, not by sympathy or outrage." 481 So.2d at 249. It is the same in today's case. The Golden Rule, unfortunately, is not a rule of law.
Willis Perry joined Sears as a serviceman in New Orleans in 1962. Over the next ten years, he completed an average of 9.3 service calls per day, as opposed to Sears' nationwide average of six. In 1972 he moved to Hattiesburg and went to work at the Sears store there. His supervisor there was co-defendant Gerald Porter. For years Perry continued to do an outstanding job; work evaluation documents prepared by Porter contain highly favorable comments. Perry alleges that Porter's attitude towards him changed after he, Perry, took time off to have surgery on his cervical vertebrae in 1982. Thereafter, Porter began giving Perry the most inconvenient and time-consuming service calls. Matters came to a head in 1983, when an opening occurred for the job of warehouse supervisor for Laurel and Hattiesburg. Perry applied for the job, but on Porter's recommendation, it was given to another. Perry became angry at this and confronted Porter, telling him that he was nothing but a drunkard and that "he gave [the job] to one of his beer-drinking buddies" rather than to the most qualified candidate.
Shortly after this incident, on May 4, 1983, Perry was at home when he received a call from Sears' personnel director Dan Zwicker, who told him to report to the warehouse. He did so. There he was confronted by Zwicker and Porter, who told him he was fired.
Based on this incident, Perry filed a complaint alleging breach of contract and wrongful termination. He asked for specific performance of the alleged contract in the way of reinstatement with all back pay and benefits. In the alternative, he sought damages in the amount of $871,000.
*1088 After Perry put on his evidence, the defendants moved for summary judgment. The trial judge granted the motion, ruling that there had been no evidence of an employment contract and observing that Mississippi recognizes no common-law cause of action for wrongful termination.

ASSIGNMENT OF ERROR.

WAS PERRY WRONGFULLY DISCHARGED?
A. Breach of contract. It is undisputed that there was no written employment contract specifying the length of Perry's employment. Thus, on the face of it, Perry would seem to fall victim to Mississippi's adherence to the common law rule that where there is no employment contract (or where there is a contract which does not specify the term of the worker's employment), the relation may be terminated at will by either party. Mississippi has followed this rule since 1858. Butler v. Smith & Tharpe, 35 Miss. (6 Geo.) 457, 464 (1858). Appellant nonetheless contends that an implied contract existed which forbade Sears to dismiss Perry without cause. The source of this implied contract is alleged to be a Sears policy handbook, incorporated in the record. We have difficulty in that the appellant's brief does not quote or cite that portion of the Sears manual supporting their claim. Nor have we been able to find any statement prescribing the procedure for termination. The only statement that seems germane to this case is found on page 35 of the Pension Plan Manual; it hardly supports the appellant's position. In bold type it says "Employment rights not implied." It further explains: "Participation in the plan does not give you the right to be retained in the employ of Sears, nor does it interfere in any way with the right of the company to discharge or terminate you at any time without regard to the effect of such discharge or termination may have on your rights under the plan."
The appellant cites numerous cases for the proposition that statements found in a personnel or pension manual or other representations can create contractual obligations, even in the absence of a written agreement. This is perfectly true. E.g. Cleary v. American Air Lines, 111 Cal. App.3d 443, 168 Cal. Rptr. 722, 729 (1980); Toussaint v. Blue Cross/Blue Shield of Michigan, 408 Mich. 579, 292 N.W.2d 880, 892-94 (1980); Weiner v. McGraw-Hill, 57 N.Y.2d 458, 443 N.E.2d 441, 442, 457 N.Y.S.2d 193, 194 (1982); Hercules Powder Co. v. Brookfield, 189 Va. 531, 53 S.E.2d 804, 808-09 (1949).
Mississippi follows a version of this rule. In 1985, we held that a written contract can be modified by a policy handbook which then becomes part of the contract, but only where the contract expressly provides that it will be performed in accordance with the policies, rules and regulations of the employer. Robinson v. Bd. of Trustees of East Central Junior College, 477 So.2d 1352, 1353 (Miss. 1985).
Neither Robinson nor any of the cases cited above are of any avail to Perry, because his employment agreement contains an express statement that Sears did not intend to waive its right to terminate him unilaterally by promulgating the policy handbooks. We found no case in which a policy agreement was held to create a factual right to dismissal for cause only in the face of such a provision. On the contrary, the cases all hold that such provision precludes any action for wrongful termination by the severed employee. Indeed, two of these cases involve Sears itself. Batchelor v. Sears, Roebuck & Co., 574 F. Supp. 1480, 1484-85 (E.D.Mich. 1983); Novosel v. Sears, Roebuck & Co., 495 F. Supp. 344, 346 (E.D. Mich. 1980). See also Crain v. Burroughs Corp., 560 F. Supp. 849, 852 (C.D.Cal. 1983); Holloway v. K-Mart Corp., 113 Wis.2d 143, 334 N.W.2d 570, 572 (1983).
This line of cases seems well grounded. If this court were to agree with Perry's argument, it would be holding that a valid, express agreement and a contradictory implied agreement can exist concerning the same subject matter at the same time. Such a result would be ludicrous.
In short, the explicit statement in the personnel handbook that Perry could be *1089 terminated at will is more than sufficient to defeat his action insofar as it is based on breach of contract.
Sears argues that even if an implied contract had existed, its dismissal of Perry was still not wrongful, since there was "cause" for the firing  to-wit; insubordination. The reference, of course, is to Perry's angry outburst against Porter. In other contexts, we have held that insubordination can be "cause" for dismissal. Merchant v. Pearl Mun. Sep. School Dist., 492 So.2d 959 (Miss. 1986); Noxubee Co. Bd. of Edu. v. Givens, 481 So.2d 816 (Miss. 1985). Our holding, however, makes it unnecessary to reach this issue.
B. Tort. Wrongful discharge actions, not founded on some theory of contract essentially sound in tort, although some of the theories have attributes associated with both contract and tort. Of these hybrids, the most prominent, (though as yet a small minority view), is the theory of the implied covenant of good faith and fair dealing. Any breach of this implied covenant by malicious termination or harassment is said to give the victim a tort action for wrongful discharge. This seems to be the theory most closely resembling the posture of appellant's brief, which lays great emphasis on the malice of Porter's conduct towards Perry. Only a few states have adopted this theory. Cleary v. American Air Lines, 111 Cal. App.3d 443, 168 Cal. Rptr. 722 (1980); Fortune v. National Cash Register Co., Inc., 373 Mass. 96, 364 N.E.2d 1251 (1977); Nicholson v. United Pacific Ins. Co., 710 P.2d 1342 (Mont. 1986). (New Hampshire adopted the theory in Monge v. Beebe Rubber Co., 114 N.H. 130, 316 A.2d 549 (1974) but has since discarded it in favor of a more limited rule allowing an action when an employee is fired for reasons contrary to public policy. Howard v. Dorr Woolen Co., 120 N.H. 295, 414 A.2d 1273 (1980)).
Even if Mississippi were to adopt such a rule, however, Perry would probably not prevail under it. California and Montana both hold that where the employee has signed an explicit agreement that he can be terminated at will, and action under the implied covenant for good faith and fair dealing is precluded. Crain v. Burroughs Corp., 560 F. Supp. 849 (C.D.Cal. 1983); Maxwell v. Sisters of Charity of Providence, 645 F. Supp. 937, (D.Mont. 1986).
A majority of the states now allow some sort of action under the so-called "public policy" exception to the at-will termination rule. Under this exception, an employee may sue if he is dismissed for doing something that furthers public policy or for refusing to do something contrary to public policy.
It is well known that in 1981 this Court was asked to carve out a public policy exception to the common law rule and flatly refused to do so. It was held that an employee who was dismissed in retaliation for filing a worker's compensation claim had no common law right to relief in the absence of any showing that the legislature by passing the workers' compensation act had intended to provide a private right of action for such plaintiffs. Kelly v. Miss. Valley Gas Co., 397 So.2d 874, 877 (Miss. 1981). A minority of states join Mississippi in refusal to recognize any exception. E.g. Martin v. Tapley, 360 So.2d 708, (Ala. 1978); De Marco v. Publix Super Markets, Inc., 360 So.2d 134 (Fla.App. 1978), affirmed 384 So.2d 1253 (Fla. 1978); Jones v. International Union of Operating Engineers, 159 Ga. App. 693, 285 S.E.2d 30 (1981).
However, in those states which recognize a public policy exception, the exception is interpreted very narrowly. One commentator has observed that courts have tended to recognize a cause of action under this public policy exception chiefly when the firing is based on the employee's (1) refusal to commit an unlawful act, (2) performance of an important public obligation or (3) exercise of a statutory right or privilege. Comment: Protecting Employees at Will against Wrongful Discharge: The Public Policy Exception, 96 Harv.L.Rev. 1931, 1932 (1983). As a rule, the public policy underlying the action must be "clearly defined and well established." Ward v. Frito Lay, Inc., 95 Wis.2d 372, 290 N.W.2d 536, 538 (1980). A leading case said that "sources of public policy include legislation, *1090 administrative rules, regulations or decisions or judicial decisions." Pierce v. Ortho Pharmeceutical Corp., 84 N.J. 58, 417 A.2d 505, 512 (1980).
In fact, so circumscribed is the public policy exception that plaintiff-minded commentators have complained that its scope is insufficient. See generally, e.g., Comment, Harv.L.Rev. supra.
The appellant is essentially asking us to overrule Kelly. Even if we should do so, it is not clear how this particular appellant would benefit from it. His grievances cannot easily be placed in any recognized category of public policy interests. Any wrong he has suffered appears to be private, rather than public.
We therefore conclude that this case does not present us with an appropriate occasion to work a major change in our jurisprudence by reconsidering the rule of Kelly. Since there is no question that the trial judge correctly applied the law as it now exists, his grant of summary judgment must be affirmed.
AFFIRMED.
WALKER, C.J., and ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, and GRIFFIN, JJ., concur.
ROBERTSON, J., specially concurs.
ROBERTSON, Justice, concurring:
The doctrine of employment at will is an embattled one. See Annotation, Modern Status of Rule That Employer May Discharge At Will Employee For Any Reason 12 A.L.R. 4th 544 (1982 and Supp. 1986). We have noted the national dissatisfaction with it. Shaw v. Burchfield, 481 So.2d 247, 253-54 (Miss. 1985). Today's opinion, with much of which I concur, makes renewed note of its troubled state but limits its discussion to the so-called "public policy exception" which has been adopted in a number of jurisdictions. In the sense that the opinion of the Court keeps alive our awareness of the general unrest regarding the at will employment doctrine, I applaud it. I write separately, however, because there are two important considerations not otherwise mentioned.
First, a proposal for modification of the doctrine I find attractive is a judicial implication of a covenant of good faith and fair dealing in employment contracts. A number of states have recognized such an approach and have presented persuasive argument in support thereof. See, e.g., Moore v. Home Insurance Co., 601 F.2d 1072, 1074 (9th Cir.1979) (applying Arizona law); Cleary v. American Airlines, 111 Cal. App.3d 443, 455, 168 Cal. Rptr. 722, 729 (1980); Gram v. Liberty Mutual Insurance Co., 384 Mass. 659, 666, 429 N.E.2d 21, 29 (1981); Gates v. Life of Montana Insurance Co., 196 Mont. 178, 184-85, 638 P.2d 1063, 1067 (1982). See also Note, Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception, 96 Harv.L.Rev. 1931, 1935-36 (1983).
Closely related is the idea that an employee's longevity of service might give rise to an implied right beyond mere terminable at will status. See, e.g., Perry v. Sindermann, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570, 580 (1971); Foley v. Community Oil, Company, Inc., 64 F.R.D. 561, 563 (D.N.H. 1974).
Beyond this, I regard it quite apparent that the adjustment of a rule such as that defining and prescribing employment at will may have an economic impact and consequences upon both employees and employers. I have lived long enough to know that on occasion such impact is counter-intuitive. See Robertson, Myth and Reality In Consumer Credit Rate Regulation, 43 Miss.L.J. 429 (1972). It behooves those who would change the rule, and as well those who would defend it, to provide us with credible economic analyses of the likely impact of the changes they advocate. All of the proposals for modifying the employment at will doctrine have as their undisguised purpose benefitting employees who are presumed to be at a bargaining disadvantage with their employers. The question is whether the changes advocated would in fact be of the benefit the proponents believe. There is some evidence that *1091 the change in rule will indeed benefit the employees. See Note, Protecting Employees At Will Against Wrongful Discharge: The Duty To Terminate Only In Good Faith, 93 Harv.L.Rev. 1816, 1828-44 (1980), although voices of caution may also be found. See Posner, Economic Analysis of Law 306-307 (3d ed. 1986).
I am simply saying that those who would press the point are obliged to do their homework. Enough of our sister states have had enough experience with several variations on the rule that there should be available substantial data regarding the impact of the proposed changes.
These things said, I concur in the affirmance of the judgment below.
HAWKINS, J., joins in this opinion.