603 So.2d 356 (1992)
Bernette BOBBITT
v.
THE ORCHARD, LTD.; The Orchard Development Co.; and the Madison Group.
No. 89-CA-1157.
Supreme Court of Mississippi.
June 17, 1992.
*357 Keith R. Raulston, Heidelberg & Woodliff, Jackson, James A. Bobo, Brandon, for appellant.
Stephen E. Gardner, James Leon Young, John S. Simpson, Young Scanlon & Sessums, Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and McRAE, JJ.
HAWKINS, Presiding Justice, for the Court:
On November 7, 1988, Bernette Bobbitt filed a complaint in the circuit court of Madison County against her nursing home employers, The Orchard, Ltd., The Orchard Development Company, and The Madison Group (The Orchard) for wrongfully discharging her. The Orchard had in effect published and disseminated "The Orchard Employee Manual," setting forth the administrative procedures which would be followed in event of an employee's incompetence or misconduct. On October 11, 1988, Bobbitt had been fired for insubordination.
Bobbitt's complaint alleged, inter alia, that The Orchard completely ignored the manual in discharging her. While disputing this, The Orchard contended that because Bobbitt's contract of employment was terminable at will by either party, the manual imposed no legal requirement that it be followed before she could be discharged. Following discovery, The Orchard moved for summary judgment, and upon the sole basis that this was a terminable-at-will contract, the circuit court held that as a matter of law The Orchard was not required to follow its manual before it discharged her, and dismissed her complaint.
We reverse, holding that when an employer publishes and disseminates to its employees a manual setting forth the proceedings which will be followed in event of an employee's infraction of rules, and there is nothing in the employment contract to the contrary, then the employer will be required to follow its own manual in disciplining or discharging employees for infractions or misconduct specifically covered by the manual.

FACTS
Because this case is before us on a summary judgment against the plaintiff Bobbitt, our recitation of facts will be summary and favorable to Bobbitt, subject to fuller development upon trial.
Bobbitt, 28 years of age, was employed as a licensed practical nurse at The Orchard, a retirement complex in Ridgeland, on July 2, 1987, following her execution of an application which stated in pertinent part:
I certify that the information given by me in this application is true and correct to the best of my knowledge and belief and I agree that if employed and it is found to be false in any way, I will be subject to dismissal without notice. I authorize the use of any information in this application to verify my statements and authorize past employers, doctors, all references and any other persons to answer any questions concerning my ability, character, reputation, and previous employment record.

I understand that the first three months of employment will be considered *358 as a period of probation and that my employment and compensation may be terminated with or without notice at any time, at the option of either The Orchard or myself. I agree to submit to any physical examination as required by The Orchard and if employed, I agree to abide by all present and subsequently issued Orchard rules. I understand that no representative, employee or resident of The Orchard has authority to enter into an agreement with me for employment for any specified period of time, or to make any agreement with me contrary to the foregoing. (Emphasis added)
In August, 1987, she was promoted to the position of assistant nursing supervisor. On October 11, 1988, after a rather mild exchange with the executive director, Sandra Simmons, over some minor problem in serving lunch, she was fired.
The Orchard had in effect a manual, "The Orchard Employee Manual," consisting of fourteen single-spaced pages outlining the policies, purposes and procedures of the nursing home complex, and the mutual responsibilities of the employees and The Orchard. Pertinent portions follow:
This Manual was prepared so you'll be aware of our policies and the benefits available.
... .
We have policies governing employee actions. These policies outline expected job performance and resident services.
... .
All licensed employees (nurses, etc.) must carry a policy of malpractice insurance for themselves.
... .
To permit you time to adapt and become acquainted, and permit your supervisor time to determine your job performance, the first three months of employment are considered probationary. During this period, you are considered a temporary employee (full time or part time).
... .
At the end of the three months, you're evaluated. .. . If evaluated as satisfactory, you gain regular employee status. If not, you are terminated.
... .
At the end of your Probation/Adjustment Period, credits [for vacation and wellness/personal days and benefits] are given retroactively as of the date of initial employment.
... .
Should you wish to resign, first inform your department head. Because advance notice is essential,... four weeks [notice] of exempt employees [is required] in order to receive payment for accrued vacation time.
... .
Except in emergency circumstances, a notice of less than the required calendar days places an employee in a position of not being eligible for re-hire.
... .
In the interest of maintaining quality personnel, along with a quality work environment, annual job performance evaluations will be scheduled with each employee.
... .
All Regular full time Employees who work 30 hours a week or more are eligible to earn vacation leave.
... .
Should an employee resign or be terminated prior to completion of a year of continuous service, that employee will not be entitled to receive any vacation pay.
Should an employee resign or be terminated by the company after completing a year of continuous employment, that employee will be entitled to receive vacation pay for vacation time earned, unless separated for the reasons listed in the Conduct and Discipline Procedures Section of this Manual (see Section XXIII) or if proper notification of resignation has not been given.
... .
The Company maintains a hospitalization, major medical, dental and life insurance program for its employees as follows:

*359 All full time Regular Employees who work an average of 30 hours per week may elect to receive Health Insurance coverage and the related Life Insurance Coverages.
... .
The Company pays 50% of the premium for employees .. . (medical and dental coverage).
... .
XXIII CONDUCT AND DISCIPLINE PROCEDURES
It is our policy to establish and enforce rules and regulations which contribute to efficient and effective productivity and satisfactory working relationships.
As a condition of employment, the employee has been informed of and has agreed to abide by the rules and regulations set forth in this Manual.
The following guidelines for employee conduct and the procedures described for administering corrective disciplinary action will be adhered to in a fair and consistent manner. We recognize the following as policy violations:
Minor Offenses:
Following is a list of those actions regarded as a Minor Offense:
MI. 1  inappropriate dress or poor appearance
MI. 2  wasting time or loitering
MI. 3  leaving the work premises without permission during working hours
MI. 4  failure to report to work on time
MI. 5  failure to record work time accurately
MI. 6  negligence in the performance of duty or productivity not up to standards
MI. 7  violation of or disregard of common safety practices, i.e., smoking in unauthorized areas
MI. 8  absenteeism
MI. 9  horseplay on the job
MI. 10  other minor offenses not included above
Generally, a Minor Offense is successfully corrected through discussion and a simple reminder. A brief notation of this offense is placed in the employee's file. The seriousness of a minor offense [sic] comes with repeated occurrences of the same incident or multiple offenses of a minor nature. A fourth Minor Offense will be regarded as a second Major Offense.
Major Offenses:
Following is a list of those actions regarded as a Major Offense:
MA. 1  falsification of personnel records, time cards, employment applications, and health records
MA. 2  neglect of duties, insubordination, disobedience (emphasis added)
MA. 3  absent for three consecutive days without notification or reasonable cause of failure to notify
MA. 4  unauthorized use or removal of company property
MA. 5  any act of fighting on company property
MA. 6  clocking the time card of another employee
MA. 7  divulging confidential information on any resident or any employee or the unauthorized release of any other material regarding company information
MA. 8  misuse of sick leave privileges and benefits
MA. 9  negligence or abuse in the use of company property or equipment
MA. 10  failure to report an accident or injury to resident, employee, visitor or self occurring on company property
MA. 11  sleeping during work hours
MA. 12  reporting to work under the influence of alcohol or narcotics, barbiturates, hallucinogenics, amphetamines, marijuana or when suffering from alcoholic hangover
MA. 13  discourteous treatment to residents
MA. 14  gambling on company premises
MA. 15  discriminatory action or harassment of one employee against another because of physical disability, race, age, sex, or religion that interferes *360 with good working conditions is prohibited
MA. 16  other major offenses not included above
An employee found in a Major Offense will receive counseling and formal written warnings  which will be signed by the employee and the department head. This document will become a part of the employee's file after having been brought to the attention of the Executive Director.
A second Major Offense will result in a disciplinary suspension (the rest of the shift and up to five (5) scheduled work days upon approval of the Executive Director).
A third Major Offense will result in dismissal of the employee.
Intolerable Offenses
Following is a list of those actions regarded as Intolerable:
IN. 1  incompetency of [sic] inefficiency in resident care
IN. 2  unauthorized possession or drinking of any alcoholic beverage or unauthorized use or possession of narcotics, barbiturates, hallucinogenics, amphetamines, or marijuana on the property
IN. 3  unauthorized possession of firearms, knives, or explosives
IN. 4  stealing from fellow employees, residents or others on company property
IN. 5  immoral or indecent conduct on company property
IN. 6  threatening, intimidating, coercing, or interfering with fellow employees on company property
IN. 7  conviction of a felony
IN. 8  flagrant abuse of company policies and standards
IN. 9  repeated infractions of minor violations or as many as three (3) Major Offenses
IN. 10  other intolerable offense not included above
An Intolerable Offense is the most serious offense and results in immediate temporary suspension until the offense can be reviewed by the department head and the Executive Director. Dismissal without notice or severance pay is the penalty for an Intolerable Offense. Dismissal is viewed as a last resort.
The disciplinary review of an Intolerable Offense includes consideration being given to the employee's past record, to the circumstances surrounding the incident, and to the effects of the offense on the departments and the facility.
A disciplinary record will be maintained on each employee recording the history of offenses.
(Appellant's Brief, pp. 4-9).
This manual had been given Bobbitt at the time she was employed.
In its response to request for admissions, The Orchard stated that it had discharged Bobbitt for insubordination. From this record, if what occurred on October 11, 1988, was in fact insubordinate conduct, it apparently was her first infraction, and under the manual Bobbitt should have received "counseling and formal written warnings." Instead of being counselled or warned, however, she was discharged that day.
Following discovery, The Orchard moved for summary judgment, and on the basis that this was a contract terminable at will, the circuit court on September 15, 1989, entered summary judgment dismissing the complaint.
Bobbitt has appealed.

LAW
In Kelly v. Mississippi Valley Gas Co., 397 So.2d 874 (Miss. 1981), the employee plaintiff sought damages for being discharged because he had put in a claim for workmen's compensation benefits. This Court stated the general rule regarding termination of contracts of employment for indefinite terms:
Mississippi follows the common law rule that a contract of employment for an indefinite term may be terminated at the will of either party. The employee can quit at will; the employer can terminate at will. This means either the employer or the employee may have a good reason, *361 a wrong reason, or no reason for terminating the employment contract.
397 So.2d at 874-75.
This, however, is not the precise question in this case. The question in this case is when an employer furnishes its employees a detailed manual stating its rules of employment, and setting forth procedures that will be followed in event of infraction of its rules of employment, can it completely ignore the manual in discharging an employee for an infraction clearly covered by the manual? Put otherwise, when an offense specifically covered by the employer's own manual provides no more severe disciplining than a warning or counseling of the employee, may the employer pay no attention to the manual and fire the employee instead?
We hold the employer to its word.
In her application Bobbitt agreed to "abide by all present and subsequently issued Orchard rules." In Robinson v. Board of Trustees of East Central Junior College, 477 So.2d 1352 (Miss. 1985), we held that an employee's handbook and manual were a part of the contract of employment:
The one page contract the parties signed specifically refers to the policies, rules, and regulations of the Board of Trustees. Although there is no evidence that the Board formally adopted the publications, they are nevertheless bound by the terms and provisions contained therein because of their use and dissemination of the publications, and the terms of the contract entered into by the parties.
477 So.2d at 1353.
We hold in this case that because the manual was given to all employees, it became a part of the contract. It did not give the employees "tenure," or create a right to employment for any definite length of time, but it did create an obligation on the part of The Orchard to follow its provisions in reprimanding, suspending or discharging an employee for infractions specifically covered therein.
In Shaw v. Burchfield, 481 So.2d 247 (Miss. 1985), in which a long time employee was discharged under a contract which expressly gave the employer the right to terminate, we expressed our growing unease with the harshness of the rule authorizing the employer to terminate an employment contract "for good reason, bad reason, or no reason at all." 481 So.2d at 255. We disposed of the argument that such a rule was fair because the employee was as free to quit as the employer to discharge him, and also signaled our direction for the future with the following comment:
"[T]he law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." Were this a case where no employment contract established expressly the ground rules for termination and where the employer was calling upon the state to furnish the law which authorized termination, we might well be charged to reconsider the at will termination rule.
481 So.2d at 254.
Neither Shaw v. Burchfield nor this case presents a precise terminable at will question, but Shaw warns employers that this Court will be looking for a wiser and more humane alternative to the terminable at will rule in an employment contract.
In Perry v. Sears, Roebuck & Co., 508 So.2d 1086 (Miss. 1987), the long time employee, just a short time before retirement, was summarily discharged following an exchange with his supervisor. We noted:
This appeal ... presents us with a story all the more depressing for being sadly familiar ... This is not the first time we have taken note of corporate callousness towards loyal workers. See, e.g., our remarks in Shaw v. Burchfield, 481 So.2d 247 (Miss. 1985). In that case, we observed with chagrin that "the attendant rights and burdens are imposed by law, not by sympathy or outrage." 481 So.2d at 249. It is the same in today's case. The Golden Rule, unfortunately, is not a rule of law.
508 So.2d at 1087. We also held that a personnel manual "can create contractual obligations, even in the absence of a written agreement." 508 So.2d at 1088.
*362 Nevertheless, we upheld the employer's right to discharge Perry because the pension plan manual itself, upon which he based his claim of some protection, specifically in bold face type gave the company the right "to discharge or terminate you at any time without regard to the effect of such discharge or termination may have on your rights under the plan;" and also because Perry's employment agreement contained "an express statement that Sears did not intend to waive its right to terminate him unilaterally by promulgating the policy handbooks." 508 So.2d at 1088.
Had there been in Shaw and Perry an employee's manual purporting to give the employees the same protection as in this case, and there had been, again as in this case, no express disclaimer or contractual provision that the manual did not affect the employer's right to terminate the employee at will, without question we would have required the employer in both cases to abide by its own manual.[1]
In McGlohn v. Gulf & S.I.R.R. Co., 179 Miss. 396, 174 So. 250 (1937), we considered whether a written agreement between a railway labor union and the railroad concerning conditions of employment applied to a union member conductor's individual unwritten contract of employment with the railroad. In holding that the union agreement was a part of the conductor's contract of employment, our language there is apt to today's holding:
Article 30 ... was designed by the union to protect its members from unreasonable, arbitrary, and unjust dismissal by the company from their employment. They were thereby rendered free from the whims, caprice, or passion of one immediately superior, and limited his right to discharge them. This, in a measure, insured peace and protection to the employee who entered in the service in knowing that he could only be demerited, suspended, or discharged by a trial, with the right of appeal to higher and fairer officials of the railroad company to supervise his case; that his case would be brought to their attention; and that presumably it would be heard without the antagonism engendered between him and his immediate superior or foreman, or without prejudice. On the other hand, this provision benefited the railroad company also, in that, as employer, its management would know that it tended to prevent revolt in the ranks of its employees from immediate sympathetic strikes caused by a real or imaginary wrong done to one of them, and thus to a great extent insured harmony between the employer and employees, raised the morale of the employees, which condition tended to secure their loyalty and espirit de corps in the service of the master. If we say in this case that the contract was terminable at will, and, therefore, could be ignored by the employer, then we have put the axe to the root of this agreement [manual in this case].
... [I]n other words, while the railroad company, generally, may have the right to terminate the contract at its will, a solemn stipulation was made by it by which it is bound not to exercise such will in a summary manner, but in a certain well-defined manner and by a stipulated course of procedure. We conclude that this section was a material, substantial part of this contract by which appellant was induced to enter into and continue in this employment, and a part of the promised consideration therefor.
179 Miss. at 408-10, 174 So. at 253.
REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
*363 ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] The Orchard also seeks to uphold the summary judgment under the following sentence in the application for employment: "I understand that the first three months of employment will be considered as a period of probation and that my employment and compensation may be terminated with or without notice at any time, at the option of either The Orchard or myself." This sentence, at the very best, creates for The Orchard an ambiguity from which it will argue at full trial that it applied to long time employment and not just the first ninety days. The ambiguity itself, however, removes this case from a summary judgment posture; Pursue Energy Corp. v. Perkins, 558 So.2d 349, 354 (Miss. 1990); Shelton v. American Ins. Co. Co., 507 So.2d 894, 896 (Miss. 1987); Shaw, 481 So.2d at 252; Dennis v. Searle, 457 So.2d 941, 945 (Miss. 1984); Aetna Cas. & Sur. Co. v. Giesow, 412 F.2d 468 (2nd Cir.1969).