798 So.2d 567 (2001)
Dan MORRISON, Appellant,
v.
MISSISSIPPI ENTERPRISE FOR TECHNOLOGY, Inc., University of Southern Mississippi, The State Board of Higher Education, State of Mississippi and Jim Meredith, Appellees.
No. 2000-CA-00522-COA.
Court of Appeals of Mississippi.
May 8, 2001.
Rehearing Denied July 31, 2001.
Certiorari Denied October 11, 2001.
*569 Woodrow W. Pringle III, Gulfport, Attorney for Appellant.
*570 Office of the Attorney General by Joy W. Beedle; Lee Partee Gore, Jackson, Attorneys for Appellees.
BEFORE SOUTHWICK, P.J., BRIDGES, and LEE, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. Summary judgment was granted to the defendants on a suit alleging wrongful termination, tortious interference with contract and other claims. The plaintiff argues on appeal that the defendants denied him procedural guarantees that arose from his employment, and that he presented sufficient evidence on his claims to create a dispute of material fact. We find no merit in the arguments and affirm.

FACTS
¶ 2. Mississippi Enterprise for Technology, Inc. (MsET) is a nonprofit corporation organized under state law in January 1994. All MsET employees are provided by the University of Southern Mississippi (USM) pursuant to a personnel services agreement entered into between MsET and USM on July 1, 1994. According to that agreement, all personnel remain employees of USM.
¶ 3. MsET announced that the corporation was seeking applicants for the position of executive director. The plaintiff, Dan Morrison, was ultimately offered the position by letter dated May 3, 1994. The letter, which was signed by Jim Meredith as MsET's board chairman, stated that Morrison would be an employee of USM and that there was sufficient funding for two years of initial employment. Morrison accepted the offer and assumed his duties as MsET executive director on July 1, 1994. No other document exists that might be a contract of employment. Morrison held the position with MsET from July 1, 1994 until he was suspended beginning on August 12, 1997. He received merit based salary increases from USM based on recommendations from MsET's board.
¶ 4. On August 11, 1997, a hearing was held by USM on a claim by a female employee that Morrison had engaged in sexual harassment. The claim later was found not to be based on sufficient evidence. At the hearing the employee alleged that MsET funds had been paid by Morrison to his first cousin for consulting work. After the hearing, Morrison arranged to meet with MsET board chairman Jim Meredith. Morrison attempted to explain to Meredith the payments that had been made to his cousin. Meredith, acting as chairman of MsET board of directors, discussed the matter with some other members of the board in a telephone conference. The result was to suspend Morrison with pay pending an investigation. Since USM was Morrison's actual employer, the suspension was affirmed by USM in an August 13, 1997 letter to Morrison from Karen Yarbrough, the university's then-acting vice president for research and planning.
¶ 5. Following an investigation, including an independent audit, the MsET board of directors met on September 16, 1997 and cast a vote of "no confidence" with respect to Morrison's continued employment as its executive director. Based on this vote, Morrison's employment was terminated by USM in a letter dated September 26, with termination to be effective on October 31, 1997.
¶ 6. In July 1998, Morrison filed suit in the circuit court of Hancock County against MsET, USM, the State Board of Higher Education and the State of Mississippi. Morrison later amended his complaint to add Jim Meredith as a defendant and to include a claim that Meredith tortiously interfered with his employment *571 contract. All defendants filed motions for summary judgment. Following a hearing on the motions, the trial court entered its memorandum opinion and judgment, dated February 14, 2000, granting summary judgment to all defendants.

DISCUSSION

I. Due process
¶ 7. When granting judgment, the lower court found that "Morrison had no protected property interest in continued employment, therefore his due process claims must ... fail." On appeal, Morrison argues that his claim of due process was not dependent upon the existence of an employment contract, but rather the claim is supported on two separate bases. One is the general grievance procedure outlined in the USM employee handbook and the other is the procedure provided in USM's ethics in research, scholarly, and creative activities policy. Morrison claims that as an employee of USM, he was entitled to these procedures. The failure of the university to follow them deprived him of due process.

A. Grievance Policy
¶ 8. We will first discuss the grievance procedure as outlined in USM's employee manual. An employee should first seek informal resolution of a dispute by giving written notice of a grievance to the first level supervisor within ten days of the incident. The supervisor then has five days to respond. If the supervisor's answer is unsatisfactory, then the employee has one week to forward the grievance to the director or academic dean, who will provide a written answer within one week. If that answer is unsatisfactory, then the employee has ten days to forward the complaint to the appropriate vice president. The vice president will evaluate the facts, meet with the employee, and render a decision within five days of the meeting. If still unsatisfied, the employee then has two weeks to file a written request with the equal employment opportunity/affirmative action officer. The university grievance committee will conduct a hearing. Its decision will be forwarded to the president, who will render the final decision within five days of the hearing.
¶ 9. On November 7, 1997, which was within ten days after the October 31 end of his employment, Morrison attempted to invoke the grievance procedure by writing a USM vice president. The university did not then follow the process that we have just summarized. Our question becomes whether any of this creates rights on which Morrison may successfully bring suit.
¶ 10. An announced procedure can create employee rights even in the absence of a contract:
When an employer publishes and disseminates to its employees a manual setting forth the proceedings which will be followed in the event of an employee's infraction of the rules, and there is nothing in the employment contract to the contrary, then the employer will be required to follow its own manual in disciplining or discharging employees for infractions or misconduct specifically covered by the manual.
Bobbitt v. The Orchard Ltd., 603 So.2d 356, 357 (Miss.1992). The employment manual in Bobbitt was later described as "a detailed hierarchical scheme of potential offenses an employee might commit together with a concrete discipline plan for dealing with such offenses." McCrory v. Wal-Mart Stores, Inc., 755 So.2d 1141, 1143 (Miss.Ct.App.1999).
¶ 11. The defendants argue that the handbook containing the grievance policy and many other explanations of employment *572 at USM, also contains a disclaimer that maintains the applicability of the "at-will" doctrine. The Supreme Court has stated that if the document setting out special procedures still makes clear that the employee-at-will status remains in effect, then an employee may be terminated without following the procedures.
In Perry v. Sears, Roebuck & Co., 508 So.2d 1086 (Miss.1987), this Court held that an employee handbook cannot be considered a contract between the employer and the employee where the handbook explicitly states that the employee can be terminated at will. The last paragraph of the Packard/GMC handbook provides that "the policies and procedures in [this] booklet do not constitute a legal contract, and do not modify the month-to-month employment relationship (which in fact may not be altered, amended or extended by any [employee], representative or agent of GM)...." The provision maintains the month-to-month employment status and preserves Packard's right to terminate Hartle at will.
Hartle v. Packard Elec., a Div. of General Motors Corp., 626 So.2d 106, 109 (Miss. 1993).
¶ 12. Here, though, the argument is not factually supported by the record. Only parts of the manual are included. We do not discover the section that contains the disclaimer. The defendants refer us to no part of the record in which the language appears and instead just quote the language in their briefs. The manual is said to contain this provision:
Employment shall be "at will" and shall be terminable "at will" by the University or staff member with or without cause. Any oral or written statements or promises to the contrary, other than contracts issues by the Board of Trustees of Institutions of Higher Learning, are not binding upon the University.
We have no reason to doubt the accuracy of the defendants' quotation, but we still cannot rely on what appears in briefs as opposed to in the record.
¶ 13. However, even without the disclaimer we find the procedure different than the kind recognized in Bobbitt. To use the Court's language in Bobbitt, an "employer will be required to follow its own manual in disciplining or discharging employees for infractions or misconduct specifically covered by the manual." Bobbitt, 603 So.2d at 357. USM's procedures were not a "rigid, detailed disciplinary scheme" as in Bobbitt. McCrory, 755 So.2d at 1144. Indeed, the USM grievance section does not even apply to what USM must initiate in order to terminate an employee. Instead, it is a means for an employee to complain about actions and conditions. Here, it was not invoked until after Morrison's termination became effective on October 31, 1997.
¶ 14. The grievance policy at USM is to "provide an immediate and fair method by which to settle disputes which may arise between the university and its employees." There are "affirmative action grievances," in which an employee alleges discrimination. That is not involved here. A "general grievance" is defined as "a work-related problem or condition which an employee believes is unfair or a hindrance to his or her effective conduct of employment." The university's consideration of whether to terminate Morrison is not a "work-related problem" that is "a hindrance to [Morrison's] effective conduct of employment." Termination in the absolute sense is a "hindrance" to doing an effective job, but surely that is not a reasonable interpretation. In addition, the policy states that an "employee may file a grievance without penalty or fear of reprisal." *573 Here, too, the concept is that the person will be continuing to work for USM but has a complaint that needs to be addressed.
¶ 15. The policy also refers to matters that are "unfair," but we read that in the context of complaints of problems or conditions at work, not complaints about no longer being employed at all. It is important that Morrison did not even initiate the procedure until after the effective date of his dismissal. Thus, instead of being a procedure to resolve work-related problems or conditions, it would be utilized here to consider whether an employee who has already left USM had been properly terminated.
¶ 16. Had the grievance policy clearly or even reasonably applied to post-termination review, then the Bobbitt analysis would be relevant. Here, though, we do not discover a clear right given to employees to have their terminations reviewed after their departure. An employer may be required to follow procedures that it establishes for "disciplining or discharging employees for infractions or misconduct specifically covered by the manual." Bobbitt, 603 So.2d at 357. This manual does not specifically cover post-termination review. Thus, we find it does not overcome the general doctrine of terminable at will employment.

B. Misconduct in Scholarly and Related Activities
¶ 17. Regardless of the effect of the grievance procedure, Morrison argues that a separate document creates procedural rights that also were ignored. Those are in USM's ethics procedures for research and scholarly and creative activities. These procedures apply to USM's investigating alleged misconduct by a member of the university relating to research and other sponsored program activities of the university. It is intended to apply to misconduct of the following types:
(1) fabrication, falsification, plagiarism, deception, or other practices that seriously deviate from the accepted practices in proposing, conducting, or reporting research, scholarly, creative, or other sponsored program activities; (2) material failure to comply with University requirements for the protection of researchers, human subjects, or the general public or for ensuring the welfare of laboratory animals; (3) material failure to protect the environment; or (4) failure to meet other material legal requirements governing research, scholarly, creative, or other sponsored program activities.
¶ 18. If the university took action against Morrison based on misconduct of the sort covered by this policy, then there would be issues to consider under Bobbitt v. The Orchard. However, USM did not discharge Morrison because of misconduct of any sort. He was an employee of USM who worked at MsET based on the personnel services agreement between those two entities. MsET satisfied itself through whatever investigation it conducted that it no longer had confidence in him. That lack of confidence was transmitted to USM. The University then had to decide whether to reassign Morrison within USM since he could no longer work at MsET under the personnel services agreement, or else terminate him. Whatever the decision, USM had no obligation to perform an investigation under the scholarly misconduct policy. The University was not acting based on its own decision regarding misconduct but instead terminated Morrison based on MsET's decision no longer to accept him as their director.
¶ 19. Whether MsET acted properly is a matter that we will discuss below, but the policy on investigating misconduct in *574 research and related areas was not a policy that applied to MsET.

II. Contract claim
¶ 20. Morrison argues that when he accepted the offer set out in the May 3, 1994 letter, a contract of employment for two years was created. He further argues that since funding for his position was renewed on a yearly basis, his contractual status was also renewed on a yearly basis, and that on his date of termination some eight months remained on his annual contract of employment.
¶ 21. We make no determination as to whether the May 3, 1994 offer letter created a contract of employment. Even if it did, it would have no effect on the outcome of this case because it would have expired on July 1, 1996. Thereafter, Morrison was an at-will employee, not an employee with successive one-year contracts until a refusal to renew was given. We are cited to no authority that someone who continues in employment after his initial contract of employment expires (and we are not holding that this letter was such a contract), gains a year-to-year contract to replace it. Instead, we find that a contract of employment for an indefinite term creates only employment at-will status. Rosen v. Gulf Shores, Inc., 610 So.2d 366, 368 (Miss.1992). Even if the 1994 letter created an initial contract of employment, a matter that might not be resolvable on summary judgment, anything after that initial term expired was at best an indefinite term.

III. Tortious interference
¶ 22. Morrison claims that Jim Meredith tortiously interfered with his employment relationship with MsET and USM. Morrison argues that the lower court erred by not addressing whether or not the allegations made against Meredith rose to the level of bad faith.
¶ 23. Mississippi law allows for recovery against those who intentionally and improperly interfere with the performance of a contract between another and a third party, causing the third party not to perform the contract and thereby causing injury. Shaw v. Burchfield, 481 So.2d 247, 254-55 (Miss.1985). Tortious interference even with at-will employment can be the basis of a claim. Levens v. Campbell, 733 So.2d 753 (Miss.1999).
¶ 24. However, "one occupying a position of responsibility on behalf of another is privileged, within the scope of that responsibility and absent bad faith, to interfere with his principal's contractual relationship with a third person." Shaw, 481 So.2d at 255. Meredith was an employee of USM, serving as the director of the Center for Higher Learning at the Stennis Space Center. Importantly here, he also served as the chairman of MsET's board of directors. The lower court was correct that Meredith occupied positions of responsibility as to the employment Morrison, and as such his actions were privileged unless they were taken in bad faith.
¶ 25. Morrison alleges that there was no privilege because Meredith's conduct sank to the level of bad faith. In support of his argument, Morrison makes several allegations which he claims makes a factual issue as to bad faith. Of course, what is necessary on summary judgment is that Morrison have presented affidavits or other evidence that goes beyond his pleadings and at least creates an issue of material fact. The trial judge did not address the bad faith question, but merely relied on the unquestioned proof of Meredith's otherwise valid immunity. Since whether a dispute of material fact exists is a question of law that is reviewed anew on appeal, *575 the failure of the trial judge to discuss the point does not in itself constitute reversible error.
¶ 26. First, bad faith raises an issue of motive. It is not necessary for direct evidence to exist, such as an admission by the defendant that he acted in bad faith. Instead, such a conclusion generally arises as an inference from other evidence. The conclusion, though, must be that the actor was malicious or recklessly disregarding the rights of the person injured.
¶ 27. How "bad faith" adds meaningfully to this tort is initially somewhat confusing. In order to prove tortious interference with a contract, a plaintiff must normally show these elements:
1) the acts were intentional and willful; 2) that they were calculated to cause damages to the plaintiffs in their lawful business; 3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant; and 4) that actual loss occurred.
Levens, 733 So.2d at 760-61. The Court also said that a "cause of action for tortious interference with a contract generally will lie against one who maliciously interferes with a valid and enforceable contract." Id. at 759-760. Does "bad faith" require that more be proven than the four normal elements of the tort? A definition of "bad faith" in the context of an insurance company's denying benefits is malice, gross negligence, or reckless disregard for the rights of others. Caldwell v. Alfa Ins. Co., 686 So.2d 1092, 1095 (Miss.1996).
¶ 28. We find that the "privilege" is merely a specific example of having "right or justifiable cause" to interfere with the relationship. Tortious interference is based on intermeddling-a tort occurs if without sufficient reason, one person intentionally interferes with another's contract even if the interference is by giving information that is completely accurate, when the purpose was to cause interference and injury results. The earliest statement of the elements of the tort suggests the connection between bad faith and the general operation of the tort:
(1) that the acts were intentional and wilful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.
Irby v. Citizens Nat'l Bank of Meridian, 239 Miss. 64, 121 So.2d 118, 119 (1960) (parenthetical in original). The act must be intentional and not merely negligent; the purpose must be to interfere with the person's lawful contract or employment relation; there must not be right nor justification involved with the interference; and loss must result. The word "unlawful" in the third element of the tort is somewhat redundant, as the "purpose of causing damage and loss" is unlawful when it is "without right or justifiable cause...."
¶ 29. This makes the bad faith exception to the privilege no more than what the parenthetical in Irby provides, namely, that when an intentional act occurs whose purpose is to cause injury to business without right or good cause, then there is malice. A person occupying a position of responsibility on behalf of another is "privileged," which is another word for having a right.
¶ 30. Now we turn to the facts of our case. Morrison argues that the known facts of his dismissal raise an adequate inference of bad faith sufficient to avoid summary judgment. Each lettered section below begins with a quoted allegation from *576 Morrison's brief, then is followed by our analysis.
¶ 31. A. "Meredith edited the independent auditor's report prior to its review by members of the MsET Board of Directors. His editing intentionally increased the prejudicial impact."
¶ 32. This auditor's report resulted from an investigation of the contracts that Morrison entered with his cousin. It was prepared by certified public accountants. There is no evidence of the nature of Meredith's editing, other than that one of the auditors was deposed and said that Meredith made "corrections, deletions and additions to the rough draft." To the extent Morrison is arguing that these auditors allowed Meredith to make substantive changes to the meaning of their report, the evidence is absent. That is perhaps a more serious charge against the auditors than against Meredith. It is not supported by the mere statement that Meredith with his knowledge of MsET was given a chance to review and note changes that he felt were justified; the auditors still had to determine if they agreed. The admission from the defendants that Meredith made editing corrections also states that he did not change anything substantive. Morrison acknowledged a belief that the auditors followed "generally accepted accounting principles," which is inconsistent with alleging that they allowed Morrison to distort the audit.
¶ 33. B. "The MsET Board of Directors meeting was called contrary to the MsET bylaws. The required notice was not given and a quorum was not present." There are significant disputes in the record regarding the meaning of the bylaws, whether adequate notice was given and whether a majority of the executive committee suffices for a quorum at a board meeting. That Meredith called the meeting as he was authorized to do, with whatever arguments there may be about notice and quorums, does not show bad faith. It at worst, if true, indicates a lack of care regarding corporate formalities. Those formalities are not an issue.
¶ 34. C. "Meredith did not admit his own involvement in several of the audit findings. In the minutes of the Executive Committee meeting by telephone Meredith claimed Morrison participated in a continued pattern of harassment and firing of staff. In fact, Morrison was cleared of these allegations." What is helpful in understanding this allegation is that conference calls involving some of the executive committee and others occurred on August 12-13, 1997, just after the charge had come to light that Morrison had been giving a cousin certain contracts. The board itself met on September 16, 1997, and adopted a "no-confidence" resolution.
¶ 35. The genesis of the focus on Morrison's contracts with his cousin was a hearing concerning a USM employee assigned to MsET who made a sexual harassment claim against Morrison. Two different women made sexual harassment or age discrimination claims. As shown in minutes from a MsET board meeting a month after Morrison's suspension, Meredith stated that "[t]he pattern of issues of contracting, harassment, conflict of interest, indicates bad judgment on the part of leadership, not criminal activity. USM may feel differently." This is the basis of Morrison's claim.
¶ 36. The evidence indicates that Meredith gave to the board a transcript of the conference call among the executive committee members from a month earlier. One of the complaints against Morrison had been resolved in his favor prior to the conference call. An official notice of a finding that "data presented did not uphold" the other claim was not made until November *577 21, 1997, well after the events that are the subject of Morrison's charges. Meredith was chairman of the board, with obligations to explain the situation that the board faced as well as he could. To mention charges against Morrison that were serious enough to lead to a USM hearing does not suggest bad faith. As pointed out in section E. below, the board was accurately informed of the resolution of the claims.
¶ 37. D. "Meredith told the Executive Committee Dr. Yarbrough was conducting an investigation. According to Dr. Yarbrough, USM never conducted an investigation." What appears to be a summary of a phone call between Meredith and some executive committee members on August 13, 1997, is in the record. A statement is in the summary that "USM had already triggered an investigation via Dr. Yarbrough." In a deposition Dr. Yarbrough later said that USM did not have authority to conduct such an investigation. However, Morrison's log of events indicates that on August 12 Dr. Yarbrough gave him a copy of USM's procedures for investigating complaints and said that this would be followed. Morrison's log suggests that Yarbrough initially thought that some USM procedure applied. Dr. Yarbrough disputes telling Morrison that USM would investigate.
¶ 38. What Meredith said in a phone call one day after the charge against Morrison first came to light would have been based on information and reasonable inferences that he then had. There is a contested issue at most of whether Dr. Yarbrough initially said that USM would investigate. We find this an immaterial dispute. That the charge against Morrison was made by someone other than Meredith and without any shown connection with him, are without dispute. The charge raised issues of favoritism in contracting that might have been improper. Morrison was suspended with pay based on whatever Meredith said in the conference call. The decision to vote "noconfidence" was made by the board a month later. USM then dismissed him. The lasting effect on Morrison arose at that later time. It was clear then that only Meredith and others at MsET had investigated, not USM. We find no support for a bad faith claim against Meredith in this.
¶ 39. E. "Grievances filed by Van Natten and Van de Kop against Morrison were referred to as staff firings and harassment. Prior to phone conferences with the Executive Committee, Meredith knew Morrison had been cleared of one grievance and the other was pending. (He was ultimately cleared of this grievance.)"
¶ 40. This matter has already been discussed under factual allegation section C. There is no evidence that the claims were found frivolous, and one claim would not be resolved for three more months. In the minutes of the board meeting someone informed the board, and it appears to have been Meredith, that Morrison had in fact been exonerated on one of the claims but the University was still investigating the other. For the chairman of the board to mention the charges that had been brought against Morrison, charges in which the board chairman in no manner is implicated, and to state that Morrison had been officially cleared of one, do not constitute evidence of bad faith.
¶ 41. F. "Pursuant to USM procedures Meredith was a complainant then and was not allowed to conduct an investigation." We have already found that these procedures did not apply to him.
¶ 42. G. "Meredith never read USM procedures." Again, since the procedures *578 do not apply, bad faith is not shown by failing to read them.
¶ 43. H. "Meredith told Board members that the McKinnon contract was oral and was for $50,000.00. In actuality there were 3-4 written contracts for a much smaller sum." There is little in the record to support Morrison's summary of what Meredith said or what allegedly was the truth. In Morrison's deposition he claims that Meredith made the allegation about $50,000 worth of oral contracts. The audit report is mentioned at various places in the record, but the report itself does not appear. We do not know what amount was mentioned at the board meeting. We did find in the record a summary of the August 13, 1997 conference call between Meredith and some other executive committee members. It stated that $16,000 was to be paid the cousin that year, with a proposal pending for $28,500. This summary was from immediately after Meredith first learned of the issue and before any meaningful inquiry had yet been made.
¶ 44. If Morrison wished to avoid summary judgment based on this charge of intentional misrepresentation, he needed to provide evidence. We were pointed specifically to no part of the record, and have only found this one reference. That is not evidence sufficient for a factual dispute of bad faith misstating of known facts about the significance of the charge against Morrison.
¶ 45. I. "Meredith did not inform the Board of the deterioration of his relationship with Morrison." What specifically Morrison was supposed to inform the Board is unclear. We do not find in the record any specifics of the relation between the two men that had to be disclosed to the board, such that failure to do so would constitute bad faith on Meredith's part.
¶ 46. J. "MsET bylaws do not allow meetings by telephone. Meredith conducted two meetings by telephone of the Executive Committee August 12 and 13, 1997. During the conference calls Meredith deliberately provided false and prejudicial information resulting in Morrison's suspension."
¶ 47. This conclusory allegation about false and prejudicial information, to the extent it is referring to allegedly false information described elsewhere in this list, has there been addressed. MsET states that this was not an executive committee meeting. Whether it was or was not, and whether it had to be such a meeting to suspend Morrison with pay, we find to be academic. Morrison's claims rise or fall on whether he was validly terminated, a matter that did not occur until a month after this telephone conference. In addition, the propriety of holding a telephone meeting of the executive committee is a state law issue. MsET was a non-profit corporation. According to its articles of incorporation, it was formed under section 79-11-137 for non-profit corporations. Under the Mississippi Nonprofit Corporation Act, unless the by-laws specifically prohibit it, even a meeting of the board can be held "through the use of any means of communication by which all directors participating may simultaneously hear each other during the meeting." Miss.Code Ann. § 79-11-255(2). The bylaws had no prohibition and the executive committee could meet by phone.
¶ 48. K. "[Mississippi Department of Economic and Community Development] funds were improperly placed in the MsET checking account rather than deposited with USM. MsET always maintained one checking account...." This allegation is incomplete in Morrison's brief. It appears to have suffered from the risks of modern day word-processing technology as what *579 we have quoted with no concluding punctuation is then followed on the next page by a legal conclusion that we did not quote that begins in mid-sentence. We will not address this final incomplete assertion.
¶ 49. In summary, Morrison has succeeded in preparing a lengthy list of indicators of bad faith. Quantity cannot overwhelm the absence of substance and materiality. A person such as Meredith with an obligation as chairman of the board to pursue allegations for which there is no suggestion that he had any connection, has to make a variety of inquiries and inform numerous people of the issue. In the course of fulfilling that obligation, he and the target of the investigation may often develop a relationship based on mutual ill will. We find nothing in the evidence to support a dispute of material fact that Meredith went beyond his righthis privilegeto investigate and engaged in malicious conduct directed at Morrison.
¶ 50. Summary judgment was appropriate on all claims.
¶ 51. THE JUDGMENT OF THE CIRCUIT COURT OF HANCOCK COUNTY GRANTING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEES IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TO BE TAXED TO THE APPELLANT.
McMILLIN, C.J., KING, P.J., PAYNE, BRIDGES, THOMAS, LEE, IRVING, MYERS AND CHANDLER, JJ., concur.