# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00754-COA

JUAN GRAY                                                          APPELLANT

v.

TOWN OF TERRY, MISSISSIPPI, MAYOR                         APPELLEES
RODERICK NICHOLSON, ALDERMEN
VIRGINIA BAILEY, BONNIE HOLLY, JOSEPH
KENDRICK JR., ELZENA JOHNSON, AND
DORIS YOUNG

DATE OF JUDGMENT:             04/15/2015
TRIAL JUDGE:                  HON. JEFF WEILL SR.
COURT FROM WHICH APPEALED:    HINDS COUNTY CIRCUIT COURT,
                              FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:       KENYA REESE MARTIN
ATTORNEYS FOR APPELLEES:      GARY E. FRIEDMAN
                              MARK DAVID FIJMAN
NATURE OF THE CASE:           CIVIL - TORTS - OTHER THAN PERSONAL
                              INJURY AND PROPERTY DAMAGE
TRIAL COURT DISPOSITION:      GRANTED APPELLEES' MOTION FOR
                              SUMMARY JUDGMENT
DISPOSITION:                  AFFIRMED – 07/19/2016
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

BEFORE IRVING, P.J., FAIR AND WILSON, JJ.

IRVING, P.J., FOR THE COURT:

¶1.    After Juan Gray signed a separation agreement and resigned as the police chief for

Terry, Mississippi, he sued the Town, the mayor, and the board of aldermen[1] for wrongful

---

[1] The board of aldermen was comprised of Virginia Bailey, Bonnie Holly, Joseph
Kendrick Jr., Elzena Johnson, and Doris Young.  For simplicity, we refer to the appellants
collectively as "the Town" unless context dictates otherwise.

discharge, breach of contract, defamation, invasion of privacy, and infliction of emotional distress. But the Hinds County Circuit Court dismissed his complaint after finding that summary judgment was appropriate. Gray appeals and claims the circuit court erred when it granted the motion for summary judgment.

¶2. Finding no error, we affirm.

FACTS

¶3. In October 2005, Gray was hired as the police chief of the Town of Terry, Mississippi. An at-will employee, Gray reported to the Town's executive officer, Mayor Roderick Nicholson. By Gray's account, he built the police department "from scratch," "there was no structure," and he "had two rooms and no equipment to work with." He further said that he "patrolled in [his] own vehicle for a year" before the Town bought a patrol car for him to use. In his complaint, Gray said that he "developed an efficient filing system" for the police department, "new [patrol] vehicles were purchased," and he prepared a proposed employee handbook. He also said that he "was instrumental in the . . . Town . . . receiving [an approximately $88,000] grant . . . for operational expenses and equipment purchase for the police department."

¶4. According to Gray, Bailey never supported him because one of her cousins was the former police chief. Gray believed that her animosity toward him deepened when her cousin and another family member were dismissed from the police department. Gray also thought that an alderman, Holly, disliked him because her nephew had been arrested, and she "was good friends with [Captain Diana] Stewart," who – as stated by Gray – "wanted to be in

2

charge" of the police department.

¶5.    Aside from "want[ing] to be in charge," Gray stated that Captain Stewart also disliked him because he would not let her take a patrol vehicle home, and he had confronted her about padding her hours.  Gray claimed that Captain Stewart had falsely accused him of taking seized money, lied about him not being on patrol, and tricked Mayor Nicholson into unlocking Gray's office so she could copy documents and forward them to the Attorney General.  Captain Stewart and other officers also once went to Mayor Nicholson with the accusation that Gray was verbally abusive to them.  Because Captain Stewart went to Mayor Nicholson with her complaints, he often attempted to mediate between her and Gray.

¶6.    Gray felt that Mayor Nicholson interfered with the day-to-day operations of the police department.  Gray gave Mayor Nicholson a copy of an Attorney General advisory opinion discussing Mississippi Code Annotated section 21-21-1 (Rev. 2015), which provides that "[t]he . . . chief of police shall be the chief law enforcement officer of the municipality and shall have control and supervision of all police officers employed by [the] municipality." But Gray maintained that Mayor Nicholson still "overstepped his bounds on many days about how things were handled in the police department."

¶7.    At the end of July 2012, Gray took a two-to-three-week leave of absence due to a family illness.  He did not designate an acting police chief.  But on July 31, 2012, Mayor Nicholson informed Gray that he had appointed Captain Stewart to act as the interim police chief.  A relatively heated exchange of emails between Gray and Mayor Nicholson followed.  Ultimately, Mayor Nicholson asked Gray to resign.  In response, Gray asked to present the

issues to the board during its August 7, 2012 meeting.  Mayor Nicholson agreed.

¶8.    Two days before the meeting, Mayor Nicholson wrote a letter to the board and recommended terminating Gray for a number of reasons.  At the board meeting, Gray went into executive session with Mayor Nicholson and the board.[2]  Although the board did not act on Mayor Nicholson's  recommendation, it implemented a sixty-day improvement plan on "the police department leadership" in order to promote significant improvement within the police department.  The details of the improvement plan are not discussed in the record.  It is unclear whether the improvement plan was ever committed to writing.  However, Gray said that he and Captain Stewart were to evaluate one another.

¶9.    On September 17, 2012, several people met with Mayor Nicholson and Gray concerning roadblocks in their neighborhood, being ticketed, and allegedly abusive behavior by Gray.  One of the residents gave Mayor Nicholson an ultimatum – "get rid of . . . Gray, [or] Mayor Nicholson would not get their votes."  According to Gray, Mayor Nicholson never asked him to "take care of" the tickets, "but the meeting and arrangement of that state[d] that . . . he was asking [him] to take care of those citations."  Gray told Mayor Nicholson and the residents that the citations would have to be discussed when they went before a judge.  Consequently, the complaining residents appeared and voiced their complaints at a special board meeting held on September 18, 2012.

¶10.   Gray felt that the residents should not have been allowed to raise their issues during

---

[2] Mayor Nicholson and the board also spoke with Captain Stewart and Captain Melvin Wilson regarding their issues with the police department.  However, Gray was not allowed to stay in the room when Captains Stewart and Wilson addressed the board.

4

the special board meeting, because the subject had not been placed on the agenda. During

his deposition, Gray stated that while he was sitting in the audience, one of the residents

cursed at him, so he stood up and asked the man to leave. Aldermen Bailey and Holly later

executed affidavits. Holly's affidavit said that Gray "loudly [told] one of the men in the

group to 'shut up' and got directly in the man's face." Gray was armed and wearing his

uniform at the time. Holly "thought [Gray's] response was disturbing and unprofessional .

. . ." Bailey's affidavit said that Gray "got into a loud verbal confrontation with one of the

men attending the meeting." Bailey was concerned "that he was raising his voice and acting

in such an unprofessional manner during a public meeting."

¶11.    After the board went into executive session, a majority of the board voted to terminate

Gray unless he resigned and accepted a severance package. Per the separation agreement

drafted by the Town's attorney, Gray would receive $5,500 in severance[3] in exchange for his

resignation. The agreement also provided that Gray would release and waive all potential

claims, including wrongful discharge, against the Town and its employees and agents. The

agreement also contained a clause prohibiting Gray, but not the Town, from disclosing the

terms of the agreement. Additionally, the agreement provided that even after signing it, Gray

had seven days to opt out of it in writing.

¶12.    On September 19, 2012, Mayor Nicholson informed Gray of the board's decision and

presented him with the agreement. On that same day, Gray and Mayor Nicholson executed

the agreement. Gray admitted that he reviewed the agreement before he signed it. By

---

[3] The severance figure represented salary owed to Gray, along with payment for his accrued vacation time.

5

signing the agreement, Gray "waive[d] and release[d] all claims . . . of any kind against the Town . . . including but not limited to all claims relating in any way to [his] employment . . . or the termination thereof . . . ." But he did "not waive any claim that may arise after [his] execution of [the a]greement."

¶13. Subsequently, Cassandra Gibson sent Mayor Nicholson a letter and a petition with more then 150 signatures seeking Gray's reinstatement. Mayor Nicholson sent Gibson a response letter stating that Gray had "signed a separation agreement effectively ending his employment with the Town . . . [on] . . . terms [that] were mutually agreed upon . . . ."

¶14. Gibson and others appeared at the board's October 2, 2012 meeting. The town clerk read the minutes of the September 18, 2012 board meeting. The minutes noted that the board had decided to terminate Gray if he refused to resign. During her deposition, Gibson said that she and another person asked about Gray's resignation, and Mayor Nicholson said that Gray would have been terminated if he did not resign and sign the agreement.

¶15. On June 28, 2013, Gray sued the Town. Within his complaint, Gray alleged that the Town was liable for: (1) wrongful and unlawful retaliatory termination, (2) breach of contract, (3) defamation, (4) invasion of privacy, and (5) infliction of emotional distress. Following discovery, the Town successfully moved for summary judgment.

¶16. The circuit court noted that Gray was an at-will employee, so he could be terminated at any time. The circuit court further held that there was no genuine issue of material fact to support Gray's claim that he was effectively terminated as retaliation for his refusal to "take care of" tickets for people. Additionally, the circuit court held that Gray waived any

existing causes of action when he signed the agreement. As for Gray's defamation claim, the circuit court held that it was not actionable, because the public had been accurately informed regarding the circumstances of his resignation. The circuit court noted that the nondisclosure clause only applied to Gray, who was prohibited from disclosing "the existence and terms of" the agreement. The circuit court struck that clause, and left the rest of the agreement intact. Other pertinent aspects of the circuit court's decision will be discussed, as necessary, below. Gray appeals.

## STANDARD OF REVIEW

¶17.    "[An appellate court] review[s] summary judgments de novo." *Rankin v. Clements Cadillac,* 903 So. 2d 749, 751 (¶11) (Miss. 2005). Rule 56(c) of the Mississippi Rules of Civil Procedure sets out that summary judgment is proper when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "[F]acts are viewed in the light most favorable to the nonmoving party." *Rankin,* 903 So. 2d at 751 (¶11). However, "[t]he existence of a genuine issue of material fact will preclude summary judgment. Where material facts are disputed, or where different interpretations or inferences may be drawn from undisputed material facts, summary judgment is inappropriate." *Id.*

## DISCUSSION

### I.      *Wrongful Discharge*

¶18.    Gray claims that the circuit court erred when it held that he had released his wrongful-

discharge claim, because the agreement is unconscionable. He also argues that there was a genuine issue of material fact regarding whether he had been terminated for refusing to participate in unlawful activity.

### A. The Agreement

¶19. As mentioned above, Gray "waive[d] and release[d] all claims . . . of any kind against the Town . . . including but not limited to all claims relating in any way to [his] employment . . . or the termination thereof . . . ." However, Gray contends that the agreement is procedurally and substantively unconscionable. He claims that the agreement is one-sided, and Mayor Nicholson only gave him ten seconds to review it. Gray also notes that the Town's attorney drafted the agreement. In addition, Gray asserts that he had very little bargaining power in that he did not want his job history to reflect that he had been fired.

¶20. Unconscionability is the "absence of meaningful choice on the part of one of the parties, together with contract terms [that] are unreasonably favorable to the other party." *Cleveland v. Mann*, 942 So. 2d 108, 114 (¶15) (Miss. 2006) (internal citation and quotation marks omitted). A contract may be procedurally unconscionable when there is a lack of knowledge or a lack of voluntariness. *Id.* A contract is substantively unconscionable when "there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach." *Caplin Enters. v. Arrington*, 145 So. 3d 608, 614 (¶14) (Miss. 2014).

¶21. We do not find that the agreement was procedurally or substantively unconscionable.

8

During his deposition, Gray stated that he was a businessman.[4]  By signing the agreement, Gray acknowledged that he "ha[d] been advised in writing to seek legal counsel and any other advice [Gray] wishe[d] with respect to the terms of the [a]greement before signing it and . . . [he] had a reasonable opportunity to do so."  Additionally, the agreement expressly gave Gray seven days to revoke it after he had signed it.  According to Gray, he believed that he was being wrongfully terminated at the time that he signed the agreement.  Even so, Gray signed the agreement, and he did not revoke it within the contemplated seven-day period.  Gray also received a $5,500 severance package, and he was able to resign instead of being terminated.  "[Mississippi law] favors the settlement of disputes by agreement of the parties and, ordinarily, will enforce the [a]greement which the parties have made, absent any fraud, mistake, or overreaching."  *McManus v. Howard,* 569 So. 2d 1213, 1215 (Miss. 1990).  We find no merit to Gray's claim that the release was unenforceable because the agreement was unconscionable.

### B.    Retaliatory Termination

¶22.    Gray argues that there was a genuine issue of material fact regarding whether he had been terminated for refusing to participate in unlawful activity by "fixing" traffic tickets.  Gray notes his deposition testimony that Mayor Nicholson appeared to suggest that Gray should dispose of tickets to appease citizen complaints.

¶23.    Gray is correct that in *McArn v. Allied Bruce-Terminix Co.,* 626 So. 2d 603, 607 (Miss. 1993), the Mississippi Supreme Court established an exception to the rule that an at-

---

[4] Gray owned a for-profit educational consulting business during his tenure as police chief, successfully applied for federal grants, and entered into contracts with the State.

9

will employee may be terminated at any time. More specifically, the supreme court held:

> [T]here should be[,] in at least two circumstances, a narrow public policy exception to the employment at will doctrine and this should be so whether there is a written contract or not: (1) an employee who refuses to participate in an illegal act . . . shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against his employer; (2) an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against his employer.

*Id*. However, that exception was further limited to "acts complained of [that] warrant the imposition of criminal penalties, as opposed to mere civil penalties." *Hammons v. Fleetwood Homes of Miss.,* 907 So. 2d 357, 360 (¶11) (Miss. Ct. App. 2004). "A plaintiff's subjective belief that the acts reported were illegal does not satisfy *McArn*." *McGrath v. Empire Inv. Holdings*, No. 1:11–CV–209–A–S, 2013 WL 85205, at *4 (N.D. Miss. Jan 7, 2013) (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 403 (5th Cir. 2005)).

¶24. As previously mentioned, Mayor Nicholson requested Gray's resignation and recommended that the board terminate his employment well before the September 2012 meeting with people who complained about traffic citations. And other than his conclusory accusations, Gray failed to provide any evidence that Mayor Nicholson asked him to "take care of" any tickets. In fact, Gray stated in his deposition that Mayor Nicholson did not verbally ask him to erase any tickets. Gray also stated that he never reported any alleged criminal acts. "We simply may not rely upon unsupported, conclusory allegations to defeat a motion for summary judgment where there are no issues of material fact." *Jacox v. Circus Circus Miss.*, 908 So. 2d 181, 184 (¶6) (Miss. Ct. App. 2005). Gray's claims do not rise to the level of "criminal" offenses necessary to support a claim under *McArn*. As such, there

is no genuine issue of material fact that would defeat the Town's motion for summary judgment.

### C. The Mississippi Tort Claims Act

¶25. Gray maintains that the circuit court erred in holding that his wrongful-discharge claim was statutorily barred under the Mississippi Tort Claims Act (MTCA). As discussed above, Gray waived his wrongful-discharge claim when he signed the agreement. Accordingly, it is irrelevant whether his wrongful-discharge claim is *also* barred by the MTCA.

### II. Breach of Contract

¶26. Originally, Gray's breach-of-contract claim was that the disclosure of "his termination to the public subjected . . . [him] to tortuous [sic] breach of contract of the confidentiality of the personnel issues of the [s]eparation [a]greement." But in his response to the Town's summary-judgment motion, Gray argued that the Town breached the sixty-day improvement plan established at the August 7, 2012 board meeting when it offered him the resignation-or-termination ultimatum before the end of the sixty-day period. Stated differently, Gray argues that the sixty-day improvement plan established the "handbook" exception as discussed in *Bobbitt v. Orchard*, 603 So. 2d 356 (Miss. 1992). In *Bobbitt*, the supreme court held:

> [W]hen an employer publishes and disseminates to its employees a manual setting forth the proceedings which will be followed in [the] event of an employee's infraction of rules, and there is nothing in the employment contract to the contrary, then the employer will be required to follow its own manual in disciplining or discharging employees for infractions or misconduct specifically covered by the manual.

*Id*. at 357.

¶27. First and foremost, Gray did not raise this claim in his initial complaint, and he never requested permission to amend his complaint. The breach-of-contract claim in his complaint related solely to Mayor Nicholson's disclosure of the terms of his resignation. Gray first raised this argument when he responded to the Town's motion for summary judgment. There is no evidence to support a finding that it was tried by consent as provided in Rule 15(b) of the Mississippi Rules of Civil Procedure. *See Presswood v. Cook*, 658 So. 2d 859, 862 (Miss. 1995). After Gray filed his response to the summary-judgment motion, the Town objected that Gray "cannot raise a claim that was never ple[aded]."

¶28. Even if Gray had properly raised the issue, there is no genuine issue of material fact that would support a finding that the Town's sixty-day improvement plan rose to the level of the employee manual as discussed in *Bobbitt*. According to the minutes of the August 7, 2012 board meeting:

> At 7:45 p.m., the executive session continued with the next item of consideration being personnel issues within the Terry Police Department. There was some discussion among Mayor Rod Nicholson, Town Attorney Edward Watson, Police Chief Gray, Captain Diana Stewart, Captain Melvin Wilson and Police Officer Russell Ellis about internal concerns within the department. At the end of the discussion, the police department leadership was advised that a [sixty]-day improvement plan would be implemented to facilitate significant improvement in various areas of the police department.

Otherwise, the terms of the improvement plan are not discussed in the record. It is unclear whether they were ever actually reduced to writing. There is no evidence that the board established any procedure that negated Gray's at-will-employee status by providing the circumstances in which he could be terminated.

¶29. [W]hile defendants carry the initial burden of persuading the trial judge that

12

no issue of material fact exists and that they are entitled to summary judgment based upon the established facts, the plaintiff carries the burden of producing sufficient evidence of the essential elements of his claim at the summary-judgment stage, as he would carry the burden of production at trial.

*Neilson v. Dawson,* 155 So. 3d 920, 923 (¶6) (Miss. Ct. App. 2014) (quoting *Karpinsky v. Am. Nat'l Ins.*, 109 So. 3d 84, 89 (¶13) (Miss. 2013)). Gray simply failed to present evidence of a genuine issue of material fact that would defeat the Town's motion for summary judgment concerning his claim that the improvement plan rose to the level of the employee manual in *Bobbitt*. There is no merit to this issue.

### III. Defamation

¶30. Next, Gray claims the circuit court erred when it granted summary judgment related to his defamation claim. According to Gray, Mayor Nicholson defamed him when he told people that Gray had resigned and signed a separation agreement. More precisely, Gray contends that Mayor Nicholson destroyed Gray's professional reputation by telling a group of people that he had resigned on mutually agreeable terms, and then informing others, in a public setting and without explanation, that he would have been terminated if he had not resigned. Gray contends that the terms were not "mutually agreed" upon, and Mayor Nicholson's disclosure of such allegations left his professional reputation tainted.

¶31. To prove defamation, a plaintiff must establish the following elements:

(1) a false and defamatory statement concerning another;

(2) an unprivileged publication to a third party;

(3) fault amounting at least to negligence on the part of the publisher;

(4) and either actionability of the statement irrespective of special harm or the

13

existence of special harm caused by the publication.

*Armistead v. Minor,* 815 So. 2d 1189, 1193 (¶7) (Miss. 2002) (quoting *Franklin v. Thompson*, 722 So. 2d 688, 692 (¶12) (Miss. 1998)). But "truth is a complete defense . . . ." *Id.* at 1194 (¶10). "[T]he threshold question is whether the . . . statements are false." *Id.* And when someone is a public figure, he "carries the added burden of showing actual malice." *Id.* at 1196 (¶17). Standing alone, "ill will or personal spite" is not enough. *Id*.

¶32. Gray cites to *Mann v. City of Tupelo,* 1995 WL 1945433 (N.D. Miss. 1995), for his position that Mississippi recognizes a tort of defamation relating to the improper disclosure of the reason for termination of employment. In *Mann,* the plaintiff raised a defamation claim over statements that she quit her job amid allegations that she had personally profited by selling dog food that had been donated to an animal shelter. *Id.* at \*\*10-13. However, the *Mann* court held that the plaintiff could not prevail because "the statement that [she] quit her job, even if false, is not a statement that would defame her character." *Id.* at \*14.

¶33. There was no genuine issue of material fact regarding whether the statements at issue were false. It is undisputed that Gray resigned and executed the separation agreement to avoid being terminated. And although the agreement provided Gray with seven days to opt out of it, he declined to do so. Under the circumstances, it is reasonable to infer that the agreement's terms were mutual agreeable. Plus, there was no evidence that Mayor Nicholson's disclosure was malicious. Gray failed to satisfy his burden to establish a genuine issue of material fact to defeat summary judgment regarding his defamation claim. Consequently, this issue is without merit.

*IV.    Invasion of Privacy*

¶34.   Gray asserted that Mayor Nicholson invaded his privacy when Mayor Nicholson informed the public that Gray had agreed to end his employment as police chief, and by representing that the Town would have terminated his employment if he had refused to resign.   Invasion of privacy is "composed of four distinct and separate sub-torts." *Williamson ex rel. Williamson v. Keith,* 786 So. 2d 390, 396 (¶24) (Miss. 2001).   Gray essentially complained that Mayor Nicholson was liable for "public disclosure of private facts." *See id.* "One who [publicizes] a matter concerning the private life of another is subject to liability . . . if the matter publicized . . . (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Id.* at (¶25).

¶35.   Mississippi law dictates that "[m]inutes shall be kept of all meetings of a public body, whether in open or executive session . . . ." Miss. Code Ann. § 25-41-11(1) (Rev. 2010). The minutes of the board's September 17, 2012 meeting reflected that Gray would have been terminated if he had not resigned and signed the agreement.  All public records are public property that "any person shall have the right to inspect . . . ." Miss. Code Ann. § 25-61-5(1)(a) (Rev. 2010).  It is undisputed that Gray's resignation was a legitimate public concern. The same is true regarding the fact that he would have been terminated if he had refused to resign.  So there is no genuine issue of material fact that would defeat summary judgment related to Gray's invasion-of-privacy claim.  As such, this issue is without merit.

*V.    Emotional Distress*

¶36.   Finally, Gray argues that there were genuine issues of material fact regarding his

15

emotional-distress claim. Although Gray's complaint contained a separate heading as though emotional distress was a separate cause of action, it is more accurate to say that he listed emotional distress and mental anguish as a form of damages, rather than a separate cause of action. To be precise, under the "emotional distress" heading in his complaint, Gray stated:

> [A]cts and conduct of the Defendants, as alleged herein, violated the policies and procedures of Defendants; and that as a result of the acts and conduct of the Defendant, there was a tortuous [sic] breach of contract that resulted in part from the failure and refusal of . . . Gray to engage in unlawful and illegal activities; and that further was in violation of the policies and procedures of Defendants [and] was beyond what a reasonable person could be expected to endure in light of the circumstances surrounding the allegations made herein . . . .

¶37. As discussed above, Gray waived any available pre-resignation claims when he executed the separation agreement. Waiver notwithstanding, to the extent that Gray adequately raised claims for intentional infliction of emotional distress, it is well established that

> [i]n order for [a plaintiff] to prevail on a claim of intentional infliction of emotional distress, he must prove [the defendant's] conduct to be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Under our law, liability does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities. Furthermore, damages for intentional infliction of emotional distress are usually not recoverable in mere employment disputes. Only in the most unusual cases does the conduct move out of the realm of an ordinary employment dispute into the classification of extreme and outrageous, as required for the tort of intentional infliction of emotional distress.

*Raiola v. Chevron U.S.A.*, 872 So. 2d 79, 85 (¶23) (Miss. Ct. App. 2004) (internal citations and quotation marks omitted). "Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving

16

a pattern of deliberate, repeated harassment over a period of time." *Lee v. Golden Triangle Planning & Dev. Dist.*, 797 So. 2d 845, 851 (¶24) (Miss. 2001).

¶38.    Gray did not present any evidence of extreme and outrageous conduct required to demonstrate a prima facie claim of intentional infliction of emotional distress. Rather, Gray presented evidence of an ordinary employment dispute. And even if Gray's complaint could be interpreted as though it contained a claim for negligent infliction of emotional distress that he had not released through the agreement, he would be required to present evidence of "some sort of injury, whether it be physical or mental." *See Evans v. Miss. Dep't of Human Servs.*, 36 So. 3d 463, 476 (¶52) (Miss. Ct. App. 2010). Gray presented no such evidence. *See id*. at (¶53). Because there was no genuine issue of material fact regarding necessary elements of either intentional or negligent infliction of emotional distress, this issue is without merit.[5]

¶39.    **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR, WILSON AND GREENLEE, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

---

[5] The circuit court also held that Gray's emotional-distress claim was precluded by the MTCA and the exclusive remedies available through the Mississippi Workers' Compensation Law. Because there is no genuine issue of material fact regarding the essential elements of Gray's claim, it is unnecessary to discuss any alternative bases for granting summary judgment.