# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00137-SCT

*WILLIAM DONALD COLLINS, SR., MARY
SKINNER COLLINS, WILLIAM DONALD
COLLINS, II, COLT MAKAI COLLINS AND LISA
MARIE COLLINS*

*v.*

*CITY OF NEWTON, MAYOR DAVID CARR,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS MAYOR OF THE CITY OF
NEWTON, CLARENCE PARKS, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS FIRE
CHIEF FOR THE CITY OF NEWTON, JOEL
SKINNER, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS FORMER FIRE CHIEF
FOR THE CITY OF NEWTON, MURRAY WEEMS,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS ALDERMAN FOR THE CITY OF
NEWTON, AND RONNIE JOHNSON,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS ALDERMAN FOR THE CITY OF
NEWTON*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/29/2016 |
| TRIAL JUDGE: | HON. VERNON R. COTTEN |
| TRIAL COURT ATTORNEYS: | JAMES GARY McGEE, JR. |
| | MARCIE TANNER SOUTHERLAND |
| | J. RICHARD BARRY |
| | JOHN GORDON ROACH, III |
| | BRIAN DOUGLAS MAYO |
| | MATTHEW ELDER RUTHERFORD, JR. |
| | KENNETH DUSTIN MARKHAM |
| | CHRISTOPHER MICHAEL GRAVES |
| | DANIEL HOWARD JUNKIN |
| | JAMES CORNELIUS GRIFFIN |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JOEL W. HOWELL, III |

ATTORNEYS FOR APPELLEES:    JAMES CORNELIUS GRIFFIN
    J. RICHARD BARRY
    BRIAN DOUGLAS MAYO

NATURE OF THE CASE:    CIVIL - TORTS-OTHER THAN PERSONAL
    INJURY & PROPERTY DAMAGE

DISPOSITION:    AFFIRMED - 03/08/2018

MOTION FOR REHEARING FILED:

MANDATE ISSUED:

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.    Several members of the Collins family sued the City of Newton and several of its officials alleging wrongful termination, intentional infliction of emotional distress, negligent infliction of emotional distress, slander, and reckless disregard of property. The defendants filed a motion for summary judgment, which the trial court denied. After a new judge was assigned to the case, the defendants filed a motion for relief or reconsideration of the denial of summary judgment under Mississippi Rule of Civil Procedure 60; the trial court granted the Rule 60 relief. The Collinses appeal from the trial court's order granting summary judgment in favor of the defendants. Discerning no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    The plaintiffs are members of a firefighting family. William Donald Collins Sr. is the patriarch of the family. Mary Collins, Donald's wife, is the matriarch. Donald was a volunteer firefighter with the City of Newton Fire Department for more than thirty years. Mary never has had any type of employment relationship with the Fire Department. Donald and Mary have three adult sons, William Donald "Donnie" Collins II, Jay Collins, and Colt Collins. Donnie and Colt were full-time, paid firefighters with the Fire Department in 2012,

when the events at issue occurred. Jay also was a full-time, paid, firefighter with the Fire Department and remains so. Colt is married to Lisa Collins, who was a volunteer firefighter with the Fire Department in 2012.

¶3. The Collinses claim that problems began in 2009, when the firefighters voted that Donnie be their chief over the then-current Chief Bounds. The Board of Aldermen ratified the vote, and Mayor David Carr vetoed the ratification. The Board overturned Mayor Carr's veto. Mayor Carr obtained an ethics opinion regarding Donnie being his brothers' boss, and the Board then declined to accept Donnie as fire chief. Donnie was made assistant chief and Walter Gordon was hired as chief. After Chief Gordon left, sometime in early 2012, Clarence Parks was hired as chief. On June 20, 2012, Chief Parks distributed a letter to all Fire Department personnel, Mayor Carr, and the Board, declaring every rank, position, and title in the Fire Department vacant, effectively stripping all firefighters of their ranks. Shortly thereafter, around July 3, 2012, Joel Skinner was made interim chief. Skinner is Mary's brother's son; thus he is Donald's and Mary's nephew and first cousin to Donnie and Colt. Around July 5, 2012, after an argument with Skinner in a meeting, Donald was terminated from the Newton Fire Department. On about July 18, 2012, Donnie and Colt were terminated from the Newton Fire Department, and Lisa was terminated about July 23, 2012.

¶4. On July 21, 2012, Donald's and Mary's home was struck by lightning, caught fire, and burned. The home was a total loss. No one was injured. The Collinses claim that, during the fire, Interim Chief Skinner did several things incorrectly. Interim Chief Skinner allegedly

3

did not have a sufficient number of firefighters to fight the fire adequately. Furthermore, the Collinses allege that the lack of commanding officers due to the elimination of all ranks led to inadequate firefighting, that Interim Chief Skinner sent firefighters away from the scene of the fire, that he fought the fire from the front when it should have been attacked from the back, that he lacked the experience to be interim chief, and that he ordered several of the Collinses to leave the scene instead of allowing them to help.

¶5.     In July 2013, Donald and Mary, Donnie, Colt, and Lisa sent notices of claims to the City of Newton. On October 29, 2013, Donald and Mary filed a complaint against the City of Newton, Mayor Carr, former Fire Chief Parks, Former Fire Chief Skinner, three of the aldermen for the City of Newton, and several John Does. In their complaint, Donald and Mary alleged wrongful termination, infliction of emotional distress, slander, and failure to respond properly to the fire at their home. They alleged that, due to the personnel changes, the Fire Department was unable to respond properly to emergencies, thereby endangering the safety of the public and property of the City of Newton. On the same day, Donnie, Colt, and Lisa each filed separate complaints against the same defendants. Each alleged wrongful termination, infliction of emotional distress, and slander. The four cases eventually were consolidated.

¶6.     After discovery, the defendants moved for summary judgment. The trial court, Judge Marcus Gordon presiding, denied the motion. The defendants moved to alter or amend the judgment under Rule 59, and the trial court denied the motion. The defendants petitioned the Court for interlocutory appeal, and the Court declined to accept the appeal and remanded

4

the case. Upon remand, Judge Gordon had left the bench. The case was assigned to Judge Vernon Cotten. The defendants then filed a motion for relief from order or reconsideration pursuant to Rule 60. The trial court granted the motion and dismissed the case.

¶7. The Collinses appeal, arguing that the court erred by revisiting the motion for summary judgment under Rule 60 and by inappropriately revisiting a prior order by another trial judge. They further argued that, even if it was appropriate to revisit the prior order, summary judgment was inappropriate.

## ANALYSIS

### I. Standard of Review

¶8. The Court reviews legal issues *de novo*. **Caves v. Yarbrough**, 991 So. 2d 142, 146 (Miss. 2008). Thus, the Court reviews the Rule 60 argument and whether it was appropriate for a successor judge to revisit a prior order *de novo*.

¶9. The Collinses argue that if the merits of summary judgment are reached, the Court should review the case under the *de novo* standard for summary judgment, as the substance of the order is to grant the motion for summary judgment. The defendants argue that the Court should review the case under an abuse of discretion standard, as granting or denying relief under Rule 60 typically is reviewed for an abuse of discretion.

¶10. Although the standard of review was not specifically discussed, cases with a similar procedural posture have been reviewed under the *de novo* summary judgment standard. *See* **Holland v. Peoples Bank & Trust Co.**, 3 So. 3d 94 (Miss. 2008) (a motion for summary judgment was denied, defendants filed a motion for reconsideration, a new trial judge granted

5

the motion for reconsideration,[1] the Court reviewed the decision under the summary judgment standard); *Duckworth v. Warren*, 10 So. 3d 433, 436-37 (Miss. 2009). The substance of the order is that it grants the defendants' motion for summary judgment, thus the Court will review the merits under the summary judgment standard.

¶11. The Court reviews a trial court's grant or denial of summary judgment *de novo*. *Crosthwait v. Southern Health Corp. of Houston, Inc.*, 94 So. 3d 1070, 1073 (Miss. 2012). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[.]" Miss. R. Civ. P. 56(c). The evidence must be viewed in the light most favorable to the opposing party. *Duckworth*, 10 So. 3d at 436-37.

**II.    The Trial Court's Authority**

¶12. The Collinses argue that Rule 60 applies only to final orders, and that the orders denying the motion for summary judgment were interlocutory in nature. As a result, they argue that it was inappropriate for the trial court to grant relief under Rule 60. They also argue that it was inappropriate for a successor trial judge to reverse the previous trial judge's rulings, citing *Amiker v. Drugs for Less, Inc.*, 796 So. 2d 942 (Miss. 2000).

¶13. It is true that the Court has stated that Rule 60 "applies only where the judgment or order is final." *Holland*, 3 So. 3d at 104. Rule 60 provides relief "from a final judgment, order, or proceeding." Miss. R. Civ. P. 60(b). Here, the trial court's reliance on Rule 60 was misplaced. However, the Court has made clear that a trial judge does have authority to revise

---

[1]Decisions on both Rule 59 and Rule 60 motions generally are reviewed for abuse of discretion. *McNeese v. McNeese*, 119 So. 3d 264, 272 (Miss. 2013).

6

an order denying summary judgment under Rule 54. ***Mauck v. Columbus Hotel Co.***, 741 So. 2d 259, 268 (Miss. 1999); *see also* ***Holland***, 3 So. 3d at 104. Rule 54 provides that certain interlocutory orders are "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Miss. R. Civ. P. 54(b). Accordingly, the trial court had authority to revise the order denying the defendants' motion for summary judgment. ***Holland***, 3 So. 3d 94; *see also* ***Tucker v. Williams***, 198 So. 3d 299 (Miss. 2016). The Court also has held that it is appropriate for a successor trial judge to revise a denial of summary judgment by the previous trial judge. ***Holland***, 3 So. 3d at 104. For the foregoing reasons, we conclude that the present issue is without merit.

### III.    Summary Judgment

#### A.    Wrongful Termination

¶14.    "Mississippi adheres to the common law doctrine of employment-at-will." ***Senseney v. Mississippi Power Co.***, 914 So. 2d 1225, 1228 (Miss. Ct. App. 2005) (citing ***Kelly v. Miss. Valley Gas Co.***, 397 So. 2d 874, 874 (Miss. 1981)). Under the doctrine, either the employer or the employee may terminate the employment relationship at will unless the parties are bound by an employment contract or a contract providing for a term of employment. ***Id***. (citing ***Perry v. Sears, Roebuck & Co.***, 508 So. 2d 1086, 1088 (Miss. 1987)). The doctrine permits an employer to terminate an employee at any time for a good reason, a wrong reason, or no reason at all. ***Id***. (citing ***McCrory v. Wal-Mart Stores, Inc***., 755 So. 2d 1141, 1142 (Miss. Ct. App. 1999)).

¶15.    The Collinses argue that Mississippi Code Section 21-31-23 provides an exception

to their at-will employment status. Section 21-31-23 provides that firefighters in the classified civil service have certain procedural rights before they may be terminated in most situations. Miss. Code Ann. § 21-31-23 (Rev. 2015). However, the code section protects only civil service employees in municipalities coming within the purview of the civil service laws. Miss. Code Ann. §§ 21-31-1, 21-31-13 (Rev. 2015). The City of Newton does not have a civil service commission and does not fall within the purview of the civil service laws, so the Collinses' argument is without merit.

¶16. Alternatively, the Collinses argue that the Newton Fire Department Standard Operating Guidelines provide an exception to the at-will employment doctrine. In *Bobbitt v. Orchard, Ltd.*, 603 So. 2d 356, 357 (Miss. 1992), the Court recognized the following exception to the employment at will doctrine:

> [W]hen an employer publishes and disseminates to its employees a manual setting forth the proceedings which will be followed in event of an employee's infraction of rules, and there is nothing in the employment contract to the contrary, then the employer will be required to follow its own manual in disciplining or discharging employees for infractions or misconduct specifically covered by the manual.

¶17. The exception created by *Bobbitt* is a narrow one.

> The question in this case is when an employer furnishes its employees a detailed manual stating its rules of employment, and setting forth procedures that will be followed in event of infraction of its rules of employment, can it completely ignore the manual in discharging an employee for an infraction clearly covered by the manual? Put otherwise, when an offense specifically covered by the employer's own manual provides no more severe disciplining than a warning or counseling of the employee, may the employer pay no attention to the manual and fire the employee instead?

*Bobbitt*, 603 So. 2d at 361.

8

¶18. At the outset, we are unpersuaded that volunteer firefighters may maintain wrongful termination claims. Such a claim has not been recognized in our State. As to the actual employees, the City of Newton, Mississippi, Employee Policy Handbook unequivocally provided that employment with the City is at will. On the first page following the table of contents, under the heading, "INTRODUCTORY STATEMENT," the Handbook provided:

> This policy guide is designed to acquaint you with the City of Newton policies and provide you with information about working conditions, employee benefits; and some of the policies affecting your employment. You should read, understand, and comply with all provisions of the handbook. It describes many of your responsibilities as an employee and outlines the programs developed by the City of Newton to benefit employees.

> No employee policy guide can anticipate every circumstance or question about policy. The need may arise and the City reserves the right to revise, supplement, or rescind any policies or portion of the handbook from time to time as it deems appropriate in its sole and absolute discretion, and with or without notice to the employees.

> NO STATEMENT IN THIS POLICY GUIDE SHOULD BE INTERPRETED AS A CONTRACT OF EMPLOYMENT BETWEEN YOU AND THE CITY OF NEWTON.

> Neither the employee nor the City of Newton is bound to continue the employment relationship if either chooses, at its will, to end the relationship at any time.

¶19. Under the heading "RESIGNATION AND DISCHARGE," the Handbook provided:

> Employees of the City of Newton work at the will of the governing authorities of the City. Discretion to hire and fire is vested in the Department Heads, i.e. the City Clerk, Chief of Police, and Director of Public Works, subject to approval by the Mayor and Board of Aldermen. Since employment with the City of Newton is based on mutual consent, both the employee and the City have the right to terminate employment at will, with or without cause, at any time.

¶20. The Handbook also contained a section titled "EMPLOYEE CONDUCT AND

9

WORK RULES," noting that it is not possible to list all the forms of behavior that are considered unacceptable in the workplace. However, a number of "examples of infractions of rules of conduct that may result in disciplinary action, up to and including employment termination" were identified. The section concluded with the following underlined provision:

> Employment with the City of Newton is at the mutual consent of the City: and the employee, and either party may terminate that relationship at any time, with or without cause, and with or without advance notice.

¶21. The Guidelines, only portions of which are in the record on appeal, state that their purpose is "[t]o establish Rules and Regulations for the personnel of the Newton Fire Department that are particular to the Fire Department and which are not included in the City of Newton Personnel Rules and Regulations, and federal or state regulations and statutes."

¶22. A federal district court, applying Mississippi law, recently addressed an issue similar to the one we face today. Former police officers filed a constitutional claim for deprivation of property without due process against the City of Shelby, Mississippi, following their termination, claiming that, due to the policies and procedures in effect during their employment, they could be discharged only for a legitimate cause and upon recommendation of the police chief. ***Johnson v. City of Shelby, Miss***., No. 2:10-CV-00036-MPM, 2015 WL 3966238, at \*\*1-2 (N.D. Miss. June 30, 2015), *aff'd*, 642 F. App'x 380 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 146 (2016). The City of Shelby argued that the police officers did not have employment contracts with the City of Shelby and therefore their employment was at will. *Id*. at \*2. The City of Shelby also argued that, even if the policies were in place at the

time of the police officers' terminations, the police officers still would not have a property interest because the City of Shelby Employee Handbook stated:

> There is no contract of employment between the City and any one or all of its employees. Employment security cannot be guaranteed for or by any employee. At all times during employment with the City of Shelby, employees shall retain the right to leave employment if they choose. Likewise, we retain the right to separate any employee from employment at any time with or without notice.

¶23. The district court acknowledged that, under ***Bobbitt***, employers may adopt policies creating a property interest in the police officers' employment. ***Id***. at \*3. However, the district court found that the City of Shelby's employee handbook specifically disclaimed a contractual relationship. ***Id***. The district court determined that "[w]here there is something in the employee handbook disclaiming a contract of employment, the rule developed in ***Bobbitt*** does not apply." ***Id***. "Further, 'disclaimers in employees' manuals having their purpose of preserving the employment at-will relationship cannot be ignored.'" ***Id.*** (quoting ***McCrory***, 755 So. 2d at 1144-45). The district court noted that the policy manual relied on by the police officers contained discretionary and permissive language regarding disciplinary actions. ***Id***. The district court concluded, "[d]iscretionary and permissive language in an employment manual . . . does not override the employees' at-will status." ***Id.*** (citing ***Senseney***, 914 So. 2d at 1229).

¶24. Similarly, we cannot ignore the three specific, unequivocal disclaimers contained in the City's Handbook. Furthermore, the exception recognized in ***Bobbitt*** does not apply to the case *sub judice*. The Court of Appeals described the breadth of the exception:

> The ***Bobbitt*** Court looked to the terms of the handbook itself and discovered,

11

not a list of duties and obligations expected of an employee, but a detailed hierarchical scheme of potential offenses an employee might commit together with a concrete discipline plan for dealing with such offenses. This plan included a listing of ten Minor Offenses, sixteen Major Offenses, and ten Intolerable Offenses, together with a sanction for each such offense that was calibrated to correspond to the perceived gravity of the infraction.

*McCrory*, 755 So. 2d at 1143.

¶25.     While the Guidelines offer "Standardized Disciplinary Actions" for "Tardiness, Uniform Violation, Safety Violation, and all other general rules and regulations violations, to be issued for individual violations with no more than 12 during a career," the Guidelines do not purport to create a comprehensive, "detailed hierarchical scheme of potential offenses an employee might commit together with a concrete discipline plan for dealing with such offenses." *See McCrory*, 755 So. 2d at 1143. The Guidelines contain discretionary and permissive language, *i.e.*, "violations may be sufficient cause for disciplinary action." The Guidelines refer to "all other general rules and regulations," which are not in the record on appeal. We do not even have the privilege of reviewing an entire copy of the Guidelines, much less "all other general rules and regulations" referenced in the Guidelines.

¶26.     In *Senseney*, the Court of Appeals aptly noted:

> We have previously found that, if an employee handbook does not provide *exclusive* permissible grounds for discharge, it is unreasonable for an employee to believe that he may be terminated only for cause. *McCrory*, 755 So. 2d at 1145 (¶ 17) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986)). Mississippi Power's guidelines concerning discharge and other forms of employee discipline speak in permissive terms of what a manager "should" do and suggest factors that should be taken into consideration. The guidelines state that discharge without warning is "normally appropriate" for only certain unlisted serious offenses. Thus, the guidelines do not purport to create a mandatory employee discipline scheme. The language of the corporate guidelines could not have led Senseney to reasonably believe that

Mississippi Power was contractually bound to warn or counsel him prior to discharge. ***Id.***

***Senseney***, 914 So. 2d at 1229–30 (Miss. Ct. App. 2005) (emphasis added).

¶27. Here, the Collinses' at-will employment status was preserved in light of the three specific, unequivocal disclaimers contained in the City's Handbook. *See **McCrory***, 755 So. 2d 1141. Also, the Guidelines do not provide "exclusive permissible grounds for discharge." *See **Senseney***, 914 So. 2d at 1229-30. Because, as a matter of law, the Guidelines "do not purport to create a mandatory employee discipline scheme," we hold that the Collinses' at-will employment status was maintained. *See **id***. Accordingly, the trial court's entry of summary judgment as to the wrongful termination claims was proper.

## B. Intentional Infliction of Emotional Distress

¶28. The Collinses assert two grounds for their intentional infliction of emotional distress claim: "(1) termination without notice, grounds, or a hearing as civil servants and in violation of their contractual employment with the City of Newton, and (2) the comments made by City representatives, including the Mayor and the Interim Fire Chief, with regard to the Collins family." The Collinses, without citation, allege that because the defendants are municipal government officials, they "are held to a higher standard of good faith and fair dealing, not to mention decency, and thus the slurs and actions taken here are certain to cause revulsion and outrage in the mind of a reasonable juror." The Collinses cite Chief Skinner's alleged threat to Donald to cut off Jay's head, that Mayor Carr allegedly was "making a personal thing" out of firing the Collinses, that Mayor Carr made "disparaging comments," and that an article was published in the Newton newspaper regarding Donald's termination.

13

¶29.    To sustain a claim of intentional infliction of emotional distress, the defendants' conduct must be wanton and willful, as well as evoke outrage or revulsion.  ***Speed v. Scott***, 787 So. 2d 626, 630 (Miss. 2001).  The severity of the acts should be such that they are atrocious and intolerable in a civilized society.  ***Id.***  Meeting the requirements is a "tall order." ***Id.***  The liability does not extend to "mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." ***Pegues v. Emerson Elec. Co.***, 913 F. Supp. 976, 982 (N.D. Miss. 1996) (quoting *Restatement 2d of Torts* § 46 cmt. d).  "A claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes." ***Id.***; ***Lee v. Golden Triangle Planning & Dev. Dist., Inc.***, 797 So. 2d 845, 851 (Miss. 2001). Viable claims for intentional infliction of emotional distress in a workplace environment usually are "limited to cases involving a pattern of deliberate, repeated harassment over a period of time." ***Pegues***, 913 F. Supp. at 982-83; ***Lee***, 797 So. 2d at 851.

¶30.    In ***Speed***, a fire department chief and volunteer firefighter were at odds, with the Chief seeing the volunteer as a potential rival trying to undermine him.  ***Speed***, 787 So. 2d at 630-31.  Over the course of about a month, the Chief allegedly called the volunteer a liar or thief or both on approximately five occasions regarding alleged lies about a newspaper publication and alleged thievery of some handwritten papers prepared for a training program.  ***Id.*** at 629-31.  The Court concluded that the conduct "was over a fairly short period of time, arose from the disagreements between the two men and perhaps fears about [the Chief's] career longevity[,]" noted the statements were not deemed credible, and that the alleged lies and thievery were regarding minor issues.  ***Id.*** at 631.  The Court held that "Speed's conduct

14

simply cannot be seen as intolerable, outrageous or revolting." *Id.*

¶31.    Regarding the "disparaging comments" made and the newspaper article, the Collinses failed to allege what statements about them were actually said or written. They failed to place the newspaper article into evidence, and the "disparaging comments" essentially rely on rumors that Mayor Carr was "talking bad" about the Collinses without any allegations regarding the actual substance of what he said to anyone that would disparage any of the Collinses. The alleged wrongful termination does not rise to the level of more than any employment dispute that may have its roots in personal animosity. While it may be true that voters would find such behavior unbecoming of a public official, it certainly does not rise to the level of outrageousness or revulsion such that it is intolerable in a civilized society.

¶32.    Regarding the threat to cut off Jay's head, liability does not extend to mere threats. *Grice v. FedEx Ground Package Sys., Inc.*, 925 So. 2d 907, 913 (Miss. Ct. App. 2006). In *Grice*, the plaintiff alleged that a manager had threatened that she would "come up missing" if she returned to work sick. *Id.* at 911. The Court of Appeals found that the one alleged threat did not give rise to liability for intentional infliction of emotional distress. *Id.* at 913. Likewise, the Collinses have not alleged any facts that would support outrageous or revolting conduct sufficient to create a genuine issue of material fact as to the issue of intentional infliction of emotional distress. Summary judgment was appropriate on the issue.

### C.    Negligent Infliction of Emotional Distress

¶33.    On appeal, the Collinses argue that "[a]s a result of the wrongful dismissals," a cause of action accrued for the resulting tort of negligent infliction of emotional distress.

15

¶34. The trial court found that Collinses were "unable to satisfy nor have they provided any evidence thereof that each suffered a physical illness which is medically cognizable requiring or necessitating the assistance of those in the medical profession." *See Wilson v. Gen. Motors Acceptance Corp*., 883 So. 2d 56, 65 (¶ 29) (Miss. 2004) (holding that a plaintiff may not recover emotional distress damages resulting from ordinary negligence without proving some sort of physical manifestation of injury or demonstrable physical harm). The Collinses wholly failed to address the trial court's finding on appeal by disputing that they indeed had suffered physical illness. Thus, we do not consider the assignment of error because the Collinses failed to meet their burden on appeal demonstrating some reversible error on the issue to the Court. *Randolph v. State*, 852 So. 2d 547, 557-58 (¶¶ 29). Because the issue was not argued in the Collinses' appellate briefing, we consider it abandoned and waived. *Sumrall v. State*, 758 So. 2d 1091, 1094 (Miss. Ct. App. 2000).

### D. Slander

¶35. To prove slander, a plaintiff must show "(a) a false statement that has the capacity to injure the plaintiff's reputation; (b) an unprivileged publication, *i.e.*, communication to a third party; (c) negligence or greater fault on part of publisher; and (d) either actionability of statement irrespective of special harm or existence of special harm caused by publication." *Speed*, 787 So. 2d at 631 (internal quotations omitted).

¶36. The Collinses fail to meet the first element of slander. They allege generally that certain defendants were "talking bad" about them and trying to prevent them from working. They also refer to a newspaper article published about Donald. Yet, they did not place the

16

article in the record, nor did they refer to any actual *statement* made by the defendants.[2] They simply refer to generalized "talking bad." The generalization is not sufficient to raise a genuine issue of material fact to defeat summary judgment. Summary judgment was appropriate on the issue.

### E. Reckless Disregard

¶37. Donald's and Mary's complaint alleges that:

> . . . as a direct result of the negligence of the Defendants, the City of Newton Fire Department was unable to properly respond to the call when the Plaintiffs' home caught fire on or about July 21, 2012. The reckless and negligent conduct of Mayor Carr and the Board of Alderman [sic] resulted in the fire department lacking the adequate infrastructure to properly respond to emergencies.

> In the early morning hours of July 21, 2012, the effect of the negligence of Mayor Carr and the Board of Alderman [sic], in approving Chief Parks'[s] recommendations of stripping the fire department of its experienced personnel, came to fruition. The Plaintiffs' home caught fire and Chief Skinner lacked the skill and experience to properly supervise the firefighters on the scene endangering the safety of the public and property of the City of Newton.

¶38. The Collinses argue that a genuine issue of material fact exists that the defendants had "[r]eckless disregard for the failure to protect the property of William Donald Collins Sr. and Mary Collins." They focus solely on criticizing how the July 21, 2012, fire was fought and the resulting property damage. The defendants claim immunity for the acts surrounding the fire at Donald's and Mary's residence, claiming that the Collinses failed to show reckless

---

[2]The only reference in the record that even could be construed as an actual "statement" was that Donald testified that his first cousin told him that Mayor Carr had said he was leaving Hardee's because "[t]here's too many Collinses in there for me." The plaintiffs have failed to indicate any evidence demonstrating the falsity of such a "statement."

17

disregard.

¶39.     Mississippi Code Section 11-46-9 provides that

> [a] governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim . . . [a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury[.]

Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2012). Reckless disregard is defined as a "higher standard than gross negligence, and it embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Davis v. City of Clarksdale*, 18 So. 3d 246, 249 (Miss. 2009) (internal quotations omitted). While it is less than an intentional act, it is more than mere negligence. *Id.* Reckless disregard usually is "accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *Id.* (internal quotations omitted).

¶40.     The plain language of the statute requires that an employee must act with "reckless disregard of the safety *and* well-being of any person." Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2012) (emphasis added). Donald and Mary do not allege that the safety and well-being of any person was endangered by the Fire Department's actions fighting the July 21, 2012, fire. Indeed, the record shows that Donald and Mary were out of the house and safe by the time the Fire Department arrived on the scene. The statute's plain language simply does not contemplate liability for actions that may relate merely to alleged reckless disregard of property. Because Donald and Mary do not allege that the actions fighting the fire

18

endangered the safety *and* well-being of any person, their claim is subject to immunity.

¶41.   Donald and Mary also allege in their complaint that certain fire department personnel decisions recklessly disregarded the safety and well-being of the public. While it may be true under some circumstances that personnel decisions could recklessly disregard the safety of the public, the allegation, without more, simply does not create a genuine issue of material fact that the defendants acted with reckless disregard under the high standard required. They do not demonstrate any facts that would create a genuine issue of material fact that the personnel decisions at issue went beyond alleged negligence and "embrace[d] willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Davis*, 18 So. 3d at 249 (internal quotations omitted). Thus, the trial court correctly granted summary judgment on Donald's and Mary's property damage claims.

## CONCLUSION

¶42.   For the foregoing reasons, we affirm the grant of summary judgment.

¶43.   **AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶44.   I agree that affirming the trial court is appropriate for the majority of the claims in this case; however, because I believe that the wrongful termination claims should survive, I respectfully concur in part and dissent in part.

¶45.   The Collinses argue that the Newton Fire Department Standard Operating Guidelines

19

("Guidelines") provide an exception to the at-will employment doctrine. One exception to the at-will doctrine is where an employee manual creates a contractual obligation. ***Bobbitt v. Orchard, Ltd.***, 603 So. 2d 356 (Miss. 1992).

¶46.     Donald Collins testified that he signed something stating he would follow the Guidelines, that he was familiar with some of the Guidelines, and that the standard procedure for terminating a firefighter, paid or volunteer, was to issue oral and written warnings first.[3] He also testified that he had received Christmas bonuses, but did not receive regular compensation or benefits. Lisa testified that the volunteers had a certain procedure that was followed to hire and terminate volunteers, and that procedure was not followed with her termination. She further testified that she had applied for permanent positions with the Fire Department and had been passed over for males, despite scoring higher than the males on both physical and written assessments. When she was terminated as a volunteer, she was in the process of obtaining her official certification as a volunteer firefighter with the Fire Academy, and was unable to continue that. She also testified that her plan was to be a full-time firefighter, and that "you need to have experience as a volunteer to be high on a list of getting hired as a full-time employee with the Fire Department. The more experience you have as a volunteer, the better your chances."

¶47.     Donnie testified that the Fire Department followed the disciplinary procedures in the

---

[3]The defendants did ask Donald about some Fire Department "Rules and Regulations" that allegedly provide that volunteers can be terminated at any time. However, these rules and regulations are not in the record. The defendants also cite in their brief to a Guideline provision requiring that Fire Department personnel acquaint themselves with the City of Newton rules and regulations, yet, that Guideline provision is not in the record.

Guidelines for terminating personnel and that it was communicated to the firefighters that these were the rules the Fire Department and its personnel abided by. Colt also testified that the procedure for termination included a verbal and then a written warning, then suspension, then termination.

¶48. The City of Newton Employee Policy Handbook ("Handbook") provides that "NO STATEMENT IN *THIS POLICY GUIDE* SHOULD BE INTERPRETED AS A CONTRACT OF EMPLOYMENT BETWEEN YOU AND THE CITY OF NEWTON." (Emphasis added.) At least two other provisions provide that employment with the City is at-will, with one stating that employees "work at the will of the governing authorities of the City. Discretion to hire and fire is vested in the Department Heads, i.e. the City Clerk, Chief of Police, and Director of Public Works, subject to approval by the Mayor and Board of Aldermen."

¶49. The Guidelines state that their purpose is "To establish Rules and Regulations for the personnel of the Newton Fire Department that are particular to the Fire Department and which are not included in the City of Newton Personnel Rules and Regulations, and federal or state regulations and statutes." The Guidelines apply to all Fire Department personnel, with personnel including "all persons, uniformed and non-uniformed, volunteers and employed by the City of Newton Fire Department." The Guidelines require all personnel to obey all laws, rules, regulations, ordinances, and orders, "and any violations may be sufficient cause for *disciplinary action*." (Emphasis added.) They provide that non-compliance with the department rules and regulations "will not be tolerated" and that "[t]hose

21

personnel committing such infractions will be subject to *disciplinary actions*." (Emphasis added.) The Guidelines then outline "Standardized Disciplinary Actions." For tardiness, uniform violation, safety violation, and all other general rules and regulations violations, "to be issued for individual violations with no more than 12 during a career[,]" the first offense receives a "[d]ocumented verbal warning/coaching/counseling session." A second offense receives a "[w]ritten reprimand." The third offense receives one "shift suspension without pay." The fourth offense warrants suspension without pay for three shifts. The fifth offense receives termination. Other disciplinary procedures are outlined for fighting and DUI. Nothing in the provisions of the Guidelines placed in the record[4] contains an express disclaimer that the Guidelines did not affect the employer's right to terminate the employee at will. Nor does the Handbook contain an express disclaimer that other policy documents outside the Handbook itself would not affect the employer's right to terminate the employee at will.

¶50. In *Bobbitt*, the Court emphasized that the employee manual containing the disciplinary procedures did not contain any "express disclaimer or contractual provision that the manual did not affect the employer's right to terminate the employee at will[.]" *Bobbitt*, 603 So. 2d at 362. In this case, nothing in the record indicates that the Guidelines expressly reserve the right to terminate the employee at will. Moreover, the Handbook only provides that nothing in that particular employee handbook affects the at-will nature of the employment. It did *not*

---

[4]It appears that only portions of the Guidelines were placed in the record, rather than the complete Guidelines. If the complete Guidelines contain such an express disclaimer, certainly it was incumbent upon the defendants to place a complete copy in the record.

expressly state that any other department policies or guidelines would similarly not affect the at-will employment. In **Bobbitt**, the employer pointed to a sentence in the application for employment that stated "I understand that the first three months of employment will be considered as a period of probation and that my employment and compensation may be terminated with or without notice at any time. . . ." **Id.** at 362 n.1. The Court found that "[t]his sentence, at the very best, creates for [the employer] an ambiguity from which it will argue at full trial that it applied to long time employment and not just the first ninety days. The ambiguity itself, however, removes this case from a summary judgment posture[.]" **Id.**; cf. **Senseney v. Miss. Power Co.**, 914 So. 2d 1225 (Miss. Ct. App. 2005) (The exception did not apply to personnel guidelines regarding discipline where the employment application explicitly stated that "I also understand and agree that nothing in this employment application, in the Company's policy statements, personnel guidelines or employee handbook is intended to create . . . an employment contract between the Company and me. I understand and agree that employment with the Company will be on an at-will basis[.]" The court noted the *express* disclaimer, with the application specifically referring to the personnel guidelines that contained the disciplinary procedures.).

¶51. "[T]he general rule is that where a contract is ambiguous and uncertain, questions of fact are presented which are to be resolved by the trier of facts, and the granting of summary judgment is inappropriate." **Shelton v. American Ins. Co.**, 507 So. 2d 894, 896 (Miss. 1987). The Handbook does not explicitly reserve the right to terminate employment at will with regard to the Fire Department Guidelines or any other documents outside of the

handbook itself. And the provisions of the Guidelines placed into the record before this Court do not explicitly reserve the right to terminate at will. The Guidelines applied to all personnel, compensated and volunteer.[5] On the record before the Court, whether the Guidelines created a contract or whether the right to terminate at will was effectively reserved is ambiguous. It is likely that consideration of extrinsic evidence is necessary, and "resolution of any uncertainties will be against the drafter of the contract[,]" which in this case is the City. *Dalton v. Cellular South, Inc.*, 20 So. 3d 1227, 1232 (Miss. 2009).

¶52. A plaintiff need not prove his case to survive summary judgment; he need only create a genuine issue of material fact. Neither the Handbook nor the Guidelines specifically refer to one another. As such, when construing the evidence in the light most favorable to the Collinses, a genuine issue of material fact exists as to whether the Guidelines created a contract and thus whether Donnie, Colt, Donald, and Lisa had a right to the disciplinary procedures outlined in the Guidelines. Therefore, summary judgment on the wrongful termination claims was inappropriate, and I would reverse the trial court on this issue.

**KITCHENS, P.J., JOINS THIS OPINION.**

---

[5]I am skeptical of the argument that a volunteer may have a successful wrongful termination claim; however, the documents in the record before this Court contain an ambiguity that creates a material issue of fact to determine whether these volunteers had any contractual rights regarding their volunteer positions. Volunteers had to follow the Guidelines, and many volunteers apparently regarded volunteering as a path to paid employment.